Richard DREISESZUN et al., Appellants-
Cross Respondents,

v.

FLM INDUSTRIES, INC., Respondent-
Cross Appellant.

Nos. KCD 28747, KCD 28753.

Missouri Court of Appeals,
Western District.

Jan. 29, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 26, 1979.

Application to Transfer Denied
April 10, 1979.

Jack N. Fingersh, Robert J. Campbell, Brown, Koralchik, Fingersh & Sildon, Kansas City, of counsel, for appellants-cross respondents.

George E. Feldmiller, Lawrence R. Brown, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel, for FLM Industries, Inc.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

SWOFFORD, Chief Judge.

This action was instituted by minority common stockholders in a Missouri corporation known as "Harzfeld's, Inc." to have the court below determine the fair market value of their stock pursuant to Section 351.-405 RSMo 1969 upon a sale of substantially all of the assets of the corporation. The trial was to the court, without a jury, and both parties thereto separately appealed from the judgment entered below, which appeals were here consolidated for review.

The underlying facts giving rise to this controversy are stipulated or undisputed. The defendant, FLM Industries, Inc., is a Missouri corporation. Prior to March 31, 1972, the corporate name of the defendant was Harzfeld's, Inc. (Harzfeld's). The corporation was engaged in operating exclusive specialty stores with five store locations in the Kansas City area and a store at Columbia, Missouri. Originally, the stock in this company was closely held, but in 1959 "went public" through an offering of 46,200 shares of its common stock at $19.50 per share, and thereafter the stock was traded over-the-counter. As of March 31, 1972, the total outstanding shares of common stock were 91,688 of which number the plaintiffs owned 3,487 shares. On that date, the numbers of the Siegel family owned 47,850 shares and thus had the controlling corporate interest. For many years, Lester Siegel, Sr. and, after his death, Lester Siegel, Jr., actively managed the business affairs of the company.

In the years immediately preceding March 31, 1972, the business affairs of the corporation, while not ever reaching a point of business crisis, did not develop in a progressive or healthy manner. For example, the average net operation earnings of Harzfeld's for the four-year fiscal period of 1956–1959 was $1.66 per share for common stock. Its gross sales for fiscal 1959 were $10,453,532.00 and for fiscal 1972, $14,603,-263.00. Taking into account the rate of inflation and the competitive necessity of adding stores in outlying shopping centers, this did not represent a healthy growth, although the net book value of the common stock had increased from $37.61 on January 31, 1968 to $42.42 on January 29, 1972. The outlook for Harzfeld's as a going concern was not promising. All of the above facts (and many others) were found by the court below in its "Findings of Fact" and no real issue is made in this case as to any of these nor the conclusion to be drawn therefrom.

In any event, the management of Harzfeld's in 1971 began exploring the possibili-

ty of merger or sale of its operation as a going concern to a larger national company in the industry, and in late 1971 such a company, Garfinckel, Brooks Brothers, Miller and Rhoades (Garfinckel), offered to purchase substantially all of Harzfeld's assets and assume its liabilities for the following considerations and upon the following basis:

1. $1,000,000.00 to be paid in cash;
2. $1,000,000.00 evidenced by an unsecured contract of Garfinckel payable $100,000.00 per year for 10 years with interest on any unpaid balance at 7%; and
3. 52,500 shares of unregistered preferred stock in Garfinckel, convertible after three years on a share-for-share basis for Garfinckel common stock paying $1.32 per year in dividends with a liquidating preference of $1,312,500.00.

On February 4, 1972, the Board of Directors of Harzfeld's accepted this offer, subject to ratification by its shareholders at a special meeting to be held on March 31, 1972. At that time, there were approximately 250 shareholders, including these plaintiffs, and, as pointed out above, the Siegal family controlled the company through majority common stock ownership. Upon receipt of this Garfinckel offer and its qualified acceptance by the Board of Directors of Harzfeld's, the two stock brokerage firms which had theretofore handled the over-the-counter sales of Harzfeld's stock (which had never been an active market but transactions in the stock had been limited and isolated [or as known in the trade a "thin"], stopped dealing in the stock entirely and declined to take either ask or bid offers in that market. As a result, the public market was rendered non-existent and no further transactions in Harzfeld's stock occurred outside of the corporate structure.

In a document dated March 6, 1972, the terms of the proposed sale to Garfinckel, including data concerning the financial conditions of the contracting parties, was sent to Harzfeld's stockholders, including the plaintiffs, together with a notice of the special stockholders' meeting to be held on March 31, 1972 and a proxy concerning the sale.

According to the document, the stockholders were notified that Harzfeld's would sell substantially all of its assets, including the right to the exclusive use of the name "Harzfeld's", in return for which Garfinckel would assume Harzfeld's liabilities, offer employment and consultatory contracts to top Harzfeld's management, and pay or obligate itself to pay the considerations hereinabove itemized. The document also informed the shareholders that the sale would generate federal income tax refunds estimated to be $375,000.00. Considered in its totality, the document stated that the projected book value per share of Harzfeld's common stock subsequent to the Garfinckel sale would be $40.00 per share. The terms so described were represented to be "the result of arm's length negotiations between the management of Harzfeld's and Garfinckel and were arrived at after careful consideration and comparison of the respective earnings, net assets and business prospects of the two companies as well as other relevant factors".

In the same mailing to the stockholders and bearing the same date of March 6, 1972, was a "purchase offer" in which Harzfeld's put forward proposals concerning its corporate structure and activity following the sale to Garfinckel. Harzfeld's would change its corporate name to FLM Industries, Inc. and would not engage in business activities nor distribute assets received as a result of the sale but would thereafter operate for an indefinite period of time as a holding or investment company. This document further offered to purchase or redeem all shares of common stock, other than those held by the Siegal family, for $23.00 per share, which the management of Harzfeld's regarded as "a fair present cash price" per share. The stated reason for the exclusion of the Siegel family from this offer was the lack of available cash to redeem all outstanding shares of stock and an unwillingness of the management to expose

Siegel family stockholders, participating in the plan, to ordinary income rates of taxation under the Internal Revenue Code. A further reason stated for this exclusion was to reduce the number of shareholders in order to avoid the necessary application, cost of registration, and periodic reporting to the Securities and Exchange Commission under the Investment Company Act of 1940. It was further stated that although there was no compulsion to redeem, the offer projected that if all minority shareholder-offerees accepted, pro forma book value of the stock held by the Siegel family would rise from $40.00 per share (following the proposed sale) to $55.00 per share.

■ The plaintiffs, as minority shareholders, received these communications and the offer of $23.00 per share and concluded such offer was inadequate and objected to the proposed disposition of the proceeds of the Garfinckel sale. They, representing 3487 shares of the Harzfeld's stock, made written objections and demand and voted against the transaction, as proposed at the stockholders' meeting held March 31, 1972. Thus, they protected their rights for judicial determination of "fair value" of their stock under Section 351.405 RSMo 1969. The sale of the assets and change of corporate name were approved and the prior approval of the Board of Directors was ratified by a majority of the stockholders at the March 31, 1972 meeting.

Apparently most of the minority shareholders, if not all, (except these plaintiffs), subsequently accepted the offer of $23.00 per share for their stock. On June 22, 1972, this suit was filed invoking Section 351.405 RSMo 1969, which provides in pertinent part as follows:

"Rights of dissenting shareholder—sale or exchange of assets

1. In the event that a sale or exchange of all or substantially all of the property and assets of a corporation, otherwise than in the usual and regular course of its business, is authorized by a vote of the shareholders of the corporation, any shareholder who shall not have voted in favor thereof and who at or

prior to the meeting at which said sale or exchange is submitted to a vote shall file with the corporation written objection thereto may, within twenty days after the vote was taken make written demand on the corporation for the payment to him *of the fair value of his shares as of the day prior to the date on which the vote was taken authorizing the sale or exchange.* * * *

* * * * * *

3. If within such period of thirty days the shareholder and the corporation do not so agree, then the dissenting shareholder may * * * file a petition in any court of competent jurisdiction * * asking for a finding and determination of the *fair value* of such shares, and shall be entitled to judgment against the corporation for the amount of such *fair value as of the day prior to the date on which such vote was taken* together with interest thereon to the date of such judgment. * * *

* * * * * *

(Emphasis added)

No issue is presented as to the accepted fact that the plaintiffs fully complied with all of the procedural steps required by this statute, and the sole issue tried below and now under review by this Court is the "fair value" of plaintiffs' stock and proper methods to be employed in order to arrive at such value.

At the trial below, the plaintiffs sought to prove that the value of their stock was a pro rata share of the value of Harzfeld's as a going concern based primarily upon the terms of the Garfinckel offer to buy the business and name recognizing that the deferred payments under the contract and the Garfinckel stock consideration should properly be discounted so as to reflect the present cash value of such considerations. While such testimony was received by the Court and is a part of the record, the effect given to such testimony was drastically limited by the trial court, as reflected in its Memorandum Opinion, where the court discusses the fact that most minority share-

holders accepted the offer of $23.00 per share. The Court then stated:

> "For the limited purpose of showing that the selling (non-dissenting) minority stockholders sold their stock for $23.00 per share with full knowledge of the details of the transaction with Garfinckel, and that their decision to accept the offer of $23.00 *was rational,* the terms of the sale to Garfinckel is received in evidence. *The price paid by Garfinckel is not received in evidence for the purpose of determining 'fair value' of the dissenting minority shares."* (Emphasis added)

Further, the court attempted to clarify this somewhat confusing statement by further stating in its Memorandum Opinion that the fact that the purchase offer was accepted by "an overwhelming majority of minority stockholders with full knowledge of what they would receive if they elected not to sell" was received "as evidence of the fairness of the price".

 It would appear from these and other statements in the Memorandum Opinion of the court below that the court abdicated, at least in part, its responsibility imposed by § 351.405(3) RSMo 1969 to find and determine the fair value of plaintiffs' stock to the decision of some minority stockholders to accept the price of $23.00 per share, no matter what may have been their reasons and regardless of whether those decisions were based upon sound accounting or business principles. "Rationality" is not the test to be applied; rather, "fair value" is the guide to the judicial obligation imposed.

The trial court's attitude is further demonstrated in a colloquy when counsel for plaintiffs was arguing as to the admissibility, probative value and forceful impact of the terms of the Garfinckel purchase in establishing the value of Harzfeld's and accordingly the fair value of plaintiffs' shares, where this appears:

> "THE COURT: Your clients (plaintiffs) didn't have the company as a whole to sell. They only had a limited number of shares to sell."

It would appear, therefore, that the court below in the situation before it would place a different "fair value" per share upon the same classification and kind of stock in a corporation depending upon whether the shares were held by a majority or a minority stockholder, and would find the value of the minority shares to be the amount which the majority stockholders were willing to pay for the minority shares and which a minority shareholder was willing to accept, whether a "fair value" or not, and hold the other minority shareholders to the consequences of that decision. Such is not the legal import or effect of § 351.405, supra. This statute does not by terms or any reasonable interpretation intend that a minority stockholder be in any way penalized for resorting to the remedy afforded thereunder.

While the trial court refused to consider all of the terms of the Garfinckel sale as evidence of "fair value" of the minority shares but only for the limited purpose of showing that the decision of those minority shareholders to accept the $23.00 per share offered was "rational", it justified the conclusion that the offer of $23.00 per share was a "fair value" for the minority stock by dividing the number of minority shares outstanding on March 30, 1972 into the $1,000,000.00 cash consideration to be paid by Garfinckel initially. This was the same method employed by the majority stockholders in making the offer. The method thus employed in evaluating the minority stock is improper, not based upon any sound or logical business or equitable principles, and affords no weight or significance to the long term considerations flowing from the Garfinckel sale nor to the admitted fact that the sale would result in an income tax refund to Harzfeld's of some $375,000.00, all of which were and are vital factors affecting the value of Harzfeld's stock.

In reaching a conclusion as to the meaning of Section 351.405, supra, as it affects the rights of the dissenting minority shareholders-plaintiffs in this action, the primary rule of statutory construction is to ascertain and give effect to the legislative intent. *State on Inf. Dalton v. Miles Laboratories,* 365 Mo. 350, 282 S.W.2d 564, 573[13] (Banc

1955). In so doing, this Court recognizes that prior to the enactment of this "judicial appraisal" statute, the unanimous consent of all the shareholders in a corporation was required to authorize the transfer of all or substantially all of a going corporation's assets. *Exchange Bank of Novinger v. Turner*, 321 Mo. 1104, 14 S.W.2d 425, 430[5, 6] (1929). On this, the Supreme Court in *Flarsheim v. Twenty Five Thirty Two Broadway Corporation*, 432 S.W.2d 245, 252[6] (Mo.1968), said:

> "Statutes dealing with the sale of substantially all of a corporation's assets are *designed primarily for the protection of dissenting shareholders of the corporation. Still v. Travelers Indemnity Company*, Mo., 374 S.W.2d 95, 100[2]. It has been said that courts should be careful not to weaken or fritter away by construction the protection given minority shareholders in exchange for dispensing with the necessity of securing unanimous consent of the shareholders for the sale of all or substantially all of the corporate assets. * * * " (Emphasis added)

In *Flarsheim*, the court characterized § 351.405 as affording *a remedy* for dissenting shareholders and setting out *the procedures to be followed* to protect their rights (l.c. 252[5]). It is not, in any logical sense, an exclusionary rule of evidence as claimed by the defendant, without citation of authority, and espoused by the court below. Rather, the underlying purpose is to assure such dissenting minority shareholders an equitable, just and "fair value" for their stock in the event of a sale of the corporate assets. Dissenting shareholders electing to pursue the remedy afforded by § 351.405 to have the "fair value" of their interests judicially determined are entitled to present any evidence, otherwise admissible, tending to establish such value without the handicap of any exclusionary rule of evidence read into the terms of such statute. Nor can the Legislature be charged with the intent to exclude the value of the stock as measured by the sale of the assets and assumption of the liabilities of the corporation and the considerations therefor formalized by solemn contract.

In this connection, it again merits comment that the terms of the Garfinckel sale were fixed and agreed upon in early February, 1972, by the Board of Directors of Harzfeld's, subject only to the approval of the stockholders in the meeting of March 31, 1972; that the Siegel family, owning the majority of the stock, could grant the majority approval of the stockholders which was the only additional step required under the statute (regardless of minority objection); and, such *de facto* approval in February was accomplished by formal approval on March 31, 1972 and thus the Garfinckel contract became binding and effective. Whatever the "fair value" of the plaintiffs' stock, it was the same on March 30, 1972, the day before the stockholders' meeting, as it was on March 31, 1972. The terms of the Garfinckel contract represented the price for which a willing seller (Harzfeld's) would sell, and a willing buyer (Garfinckel) would pay, for the business as a going concern representing the result of arm's length, fair and knowledgeable negotiations.

There is, of course, "no simple, precise mathematical formula" for determining the "fair value" of corporate stock under § 351.405 or other statutes employing this term. Each case presents different elements of value and each must be viewed separately. However, in *Phelps v. Watson-Stillman Company*, 365 Mo. 1124, 293 S.W.2d 429 (1956), (a case involving determination of "fair value" of stock upon consolidation of corporations) the court stated (l.c. 433[3]):

> " * * * in general some of the factors to be considered and weighted (sic) are asset value, earnings, dividends, management and '*Every relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of corporate stock* * * * .' " (Emphasis added)

It should be here noted that the plaintiffs, as minority shareholders, voted against the proposed sale to Garfinckel because they disagreed with the division of the sale proceeds wherein they and other

minority shareholders would receive $23.00 per share and the Siegel family a package of assets of worth of more than $40.00 per share. The plaintiffs had no quarrel with the sale price or terms. The trial court found these facts in No. 50 of its Findings of Fact.

■ It is also worthwhile to again note that the Siegel interests desired to continue the corporation under the changed name of FLM Industries as a personal holding company for tax purposes and savings and were desirous of acquiring the minority stock in order to avoid periodic expense under federal regulations, which would be incurred if the number of stockholders exceeded 100. Further, the trial court found that the offer of $23.00 per share to the minority stockholders was the only "bona fide offer" at the time. This finding is without significance in light of the fact that no market existed for the stock after the announcement of the proposed Garfinckel sale since the stock had been in effect withdrawn from the over-the-counter market by the brokers theretofore trading in it. Coupled with the fact that the defendant's testimony was that this figure was arrived at as a result of largely altruistic reasons, renders meaningless the $23.00 offer as reflective of the "fair value" of the stock.

In light of the sale of Harzfeld's, at a price conceded by all the parties involved, including the parties herein, to be a fair and reasonable price, the usual criteria, otherwise useful in evaluating the fair value of the stock, including Harzfeld's business difficulties, capital situation, inventories, dividend history, book value and market value of its stock and store locations and condition fade into relative insignificance. The overriding, compelling and decisive factors vital here to the ascertainment of "fair value" for the dissenters' stock are the terms of the Garfinckel sale considered as a whole and reduced to cash value as of March 30, 1972 and March 31, 1972 of the considerations flowing therefrom.

■ The minority dissenting stockholders, plaintiffs here, enjoyed certain fundamental rights as common stockholders in Harzfeld's, which are thus generally expressed in 18 C.J.S. Corporations § 216, p. 648:

" * * * A common stockholder is an owner of the enterprise in proportion that his stock bears to the entire stock and ordinarily he is entitled to participate in the management, profits and ultimate distribution of assets of the corporation. * * * "

Or, as stated differently, a share of common stock is evidence of unit ownership of the whole, each unit being of equal value such that their sum equals the value of the whole. 18 C.J.S. Corporations § 515, p. 1194.

Disregarding this fundamental concept, the court below, quoting from *Flarsheim,* supra, as a conclusion of law held that the plaintiffs here by resorting to this action to have their shares judicially appraised "assumed the risk of receiving less than a distributive share" of the sale proceeds and that "fair value" for the plaintiffs' share might be more or less than (they) would have received" had (they) approved the sale. This statement (and others) in *Flarsheim* cannot be faulted as general rules relating to minority shareholders' rights (and risks) under Section 351.405, supra, but the factual background upon which it rests is clearly distinguishable. In *Flarsheim,* the principal business of Seavey-Flarsheim Brokerage was that of a food broker with principals of over 300 food producers and sales offices in 10 cities. It had little or no inventory or stock in trade although it owned considerable real estate, some of which was used for headquarters and offices. Its principal assets of interest to the purchaser, Hoosier Brokerage Company, were its customers, good will, contacts and sales and service force. The sale included all of its physical properties, good will, use of name, business records and going concern status, but excluded all non-operating assets.

The majority of the stockholders of the seller changed the name of the corporation to Twenty Five Thirty Two Broadway Corporation after the sale with the express

purpose that all of the assets be liquidated and the corporation dissolved and the proceeds distributed to the shareholders over a period of approximately a year, in accordance with certain federal income tax regulations. These latter objectives were to be accomplished as a voluntary dissolution of a Missouri corporation under Section 351.465 through 351.480 RSMo 1969, which sections the defendant claimed created an immunity from Section 351.405, supra, the judicial appraisal of "fair value" remedy pursued by both the minority stockholders in *Flarsheim* and in the case at bar. The Court in *Flarsheim* soundly rejected this claim and evidence of the fair value of the stock was offered by both sides based upon sophisticated, detailed and conflicting theories. The opinion is silent as to the purchase price paid by Hoover for the business and neither the trial court, counsel, nor the Supreme Court considered that factor.

Of course, a minority stockholder who has foregone his right to a judicial appraisal of the fair value of his stock upon a sale of the assets under Section 351.405, supra, rather than remain an owner of the new proposed operation or liquidation of the company may, in fact, ultimately receive more or less than if he had asserted his rights under the statute. But that is his free choice and a court can impose no limitations upon the exercise of that right.

Here, the trial court did impose such limitations, in that it held as a matter of law that the "fair value" of the plaintiffs' stock was the price of $23.00 per share because such was the highest *bona fide* offer for their stock, an offer made by the defendant after the stock had been withdrawn from any market and the terms of the Garfinckel sale were agreed upon and needed only the affirmative vote of the majority of the stockholders who had, in fact, negotiated and espoused the agreement. This value per share of the stock was adopted by the trial court in the face of the fact that the book value of Harzfeld's stock on January 29, 1972 was $42.42 and the projected book value following the Garfinckel sale was $40.00 per share. This

judicial limitation is repugnant to the concept of corporate democracy and the equitable principles for which the term "fair" in the statutory term "fair value" stands and constitutes a weakening and "frittering away" of minority rights which the court in *Flarsheim* condemned as contrary to the very intent and design of the statute.

Certainly, this Court refuses to ascribe to the Legislature any intention to permit the majority stockholders, under the facts in this case, to either fritter away any right of the minority shareholders by some imaginative rule of exclusion of evidence, read into the otherwise plain terms of the statute in the face of the existence of real and present measuring sticks leading to the goal of "fair value", for tax, family, to conserve cash, or for any other personal reasons.

*Flarsheim* is deserving of one further comment. The court there held (l.c. 253[7]), that:

> "The clear intention of § 351.405 is to change the status of a dissenting shareholder to that of a creditor at least superior to the distributive rights of the remaining shareholders. In 13 Fletcher Cyclopedia of Corporations, § 5898, p. 333, it is stated that: 'The right of dissenters to payment takes precedence over the right of other stockholders to distribution' * * * ."

The defendant cites a multitude of cases in its brief, each of which has been given close scrutiny, and, are found distinguishable on the facts or lacking in persuasion. Many of them deal with elaborate techniques developed in Delaware which expound means of determining the value of traded common stock where either the corporation itself has no market price or the asset sale itself (and not the proposed distribution of the proceeds) was directly challenged; others involve merger or consolidation; and, still others where the dissenters seek to establish a value for their shares in excess of their proportional interest.

The terms, conditions and value to the Harzfeld's stockholders on March 30, 1972 and March 31, 1972 of the Garfinckel

sale were the proper means for judicial appraisal of the "fair value" of the plaintiffs' stock, were admissible, and should have been received and weighed as the overriding and relevant facts for the court's appraisal and computation of a judgment. The court below erred in excluding any of these matters and in so doing it erroneously declared and applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976); Rule 73.01.

The pro rata value of the plaintiffs' stock must be computed upon the terms of the Garfinckel purchase, i. e. 1) the cash payment of $1,000,000.00; 2) the net reasonable cash value of the Garfinckel contractual obligation to pay an additional $1,000,000.00 over the ten-year period; 3) the net reasonable cash value of the Garfinckel stock consideration; and 4) the income tax refund to Harzfeld's flowing from the sale.

The record before this Court contains conflicting evidence as to items 2 and 3 above, which evidence was, however, excluded from consideration by the court. Under the mandate of this decision the court below must now consider and weigh such evidence and should permit the parties, if they so desire, to offer additional evidence in this limited area. The court should then make appropriate findings of fact and conclusions of law and enter a new judgment for the plaintiffs based upon the formula herein prescribed.

*The judgment is therefore reversed and the cause remanded for further proceedings.*

All concur.