721 F.Supp. 1102 (1989)
Robert F. HUNTER, Plaintiff,
v.
MITEK INDUSTRIES, INC., Defendant.
No. 88-0274C(3).
United States District Court, E.D. Missouri, E.D.
April 11, 1989.
Richard J. Pautler and Mark Packer, Peper, Martin, Jensen, Maichel and Hetlage, St. Louis, Mo., for plaintiff.
Wilbur L. Tomlinson, Armstrong Teasdale Kramer Vaughan & Schlafly, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court on the merits of plaintiff's claims after a two-day trial before the Court sitting without a jury.
This is a diversity case under Missouri's shareholder dissenters rights statute, Mo. Rev.Stat. § 351.455 (1986). The action arises from the merger of Mitek Industries, Inc. ("Mitek") with Gang-Nail Systems, Inc. ("Gang-Nail"). The merger was approved by a majority of Mitek's shareholders on October 23, 1987, and completed in November 1987. Mitek (or "New Mitek") is the company resulting from the merger.
Pursuant to Mo.Rev.Stat. § 351.455, plaintiff brings this action as a dissenting shareholder. Section 351.455 provides that a shareholder in a company, who objects to a merger involving the company, is entitled to receive the fair value of his shares as of the day prior to the date the merger was approved by a majority of the company's shareholders. If the dissenting shareholder and the surviving company cannot agree on the fair value of his shares, the dissenting shareholder is entitled to bring suit against the surviving company in the merger for appraisal by the Court of the fair value of the dissenting shareholder's stock as of the day prior to the date the merger was approved.
This cause was tried to the Court on September 19-20, 1988, and upon careful consideration of the testimony and evidence admitted, and the arguments and memoranda of counsel, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Robert F. Hunter is an individual and was a citizen and resident of the State of Texas at all times pertinent to the issues herein. Plaintiff is the owner of 40,591 shares of Mitek stock, or 10.3% of the 391,563 shares of Mitek outstanding at the time of the merger. Plaintiff acquired *1103 his shares through an incentive program for officers of Mitek instituted by Paul Cornelsen, and paid five cents per share for his shares, or a total of $2,029.55.
2. As of October 22, 1987, the valuation date under Mo.Rev.Stat. § 351.455, a total of 391,563 shares of Mitek were issued and outstanding and owned by eight persons, all of whom, except for plaintiff, were officers or employees of Mitek.
3. Plaintiff was formerly one of the principal executive officers of Mitek, as well as a member of its board of directors.
4. Defendant New Mitek is the surviving corporation of the merger of Mitek with and into Gang-Nail. Defendant is a Florida corporation with its registered office and principal place of business in St. Louis County, Missouri.
5. On October 23, 1987, a plan of merger of Mitek and Gang-Nail was submitted for approval at a meeting of Mitek's shareholders. By the requisite majority vote, Mitek's shareholders approved the merger. The day prior to the vote by the Mitek shareholders, October 22, 1987, is the valuation date as prescribed by Mo.Rev.Stat. § 351.455.
6. On October 22, 1987, the day preceding the Mitek shareholders' meeting, plaintiff filed with Mitek a written objection to the planned merger of Mitek with and into Gang-Nail. On October 23, 1987, plaintiff did not vote his shares in favor of the merger at the shareholders' meeting.
7. The plan of merger was conditioned upon the closing of the transactions contemplated in a joint venture agreement between Mitek and Bowater Industries, plc ("Bowater"). This transaction was contingent upon completion of the transactions contemplated in a stock purchase agreement between Mitek and Gang-Nail. As a result of these interrelated transactions, Mitek and Gang-Nail would merge and split ownership of the new company with Bowater. Mitek would own fifty-one percent of the new company, and Bowater would acquire a forty-nine percent equity position in the merged entity. In exchange for these interests in the new company, the Mitek group was to contribute Mitek, and Bowater was to contribute an amount of finances based on the value of Mitek.
8. The proposed merger was approved by the requisite majority of Mitek's shareholders subject to the negotiation of satisfactory terms for the joint venture agreement and the stock purchase agreement.
9. The joint venture agreement and stock purchase agreement were closed on November 6, 1987, and the merger of Mitek and Gang-Nail was effective as of November 16, 1987.
10. Plaintiff filed this action under § 351.455 on February 11, 1988. Plaintiff's compliance with the provisions of § 351.455 for the exercise of his rights as a dissenting shareholder is not at issue. Pursuant to § 351.455, plaintiff made written objection to the proposed merger prior to the shareholders' vote; made timely written demand for payment of the fair value of his shares after the effective date of the merger; and timely filed this cause of action within ninety days after the merger became effective.
11. Plaintiff has in his possession the stock certificates evidencing his ownership of 40,591 shares of Mitek common stock. Plaintiff is ready, willing, and able to surrender his shares upon payment to him of the fair value of his stock as of October 22, 1987, the valuation date.
12. Mitek was one of the largest companies in the United States and the international market in the connector plate industry. Mitek's business included manufacturing and distributing connector plates, and providing engineering/design services to its customers and to manufacturers of building components for construction of homes and light commercial buildings. Mitek conducted these businesses primarily through its Hydro-Air Engineering, Inc., and Hydro-Air International subsidiaries.
13. Mitek's reputation within the connector plate industry was important because the connector plate industry is a competitive business, and an important part of Mitek's business was to provide its engineering/design services to its customers. Mitek had achieved the reputation for providing high quality plates, engineering services, and machines since the company's founding in the 1950's.
*1104 14. Since 1982, Mitek had experienced substantial and steady annual growth. Mitek's operating income was $4.6 million for the twelve-month period immediately preceding the valuation date. Herbert McCurdy, Mitek's chief financial officer, testified that Mitek's forecasted operating income for each of the years 1988, 1989, and 1990 was $4.7 million if Mitek continued to exist as an independent company without merging, but after reforecasting and directional forecasting as the result of the pending merger, Mitek's expected annual operating income increased to $5.2 million.
15. Prior to the valuation date, Mitek, in a negotiated financial transaction with Bowater, indicated Mitek's value was $27.1 million or $69 per share. In a letter to Mitek's directors dated August 10, 1987, Paul Cornelsen, chairman of Mitek, noted that Mitek reached an agreement to a financial transaction based upon Mitek's present valuation. At trial, Cornelsen admitted his reference to Mitek's market valuation at that time was the $27.1 million value of Mitek given in the summary of the financial terms of the Mitek/Bowater joint venture in the August 10, 1987, letter. Brown Brothers Harriman prepared the summary chart and arrived at the $27.1 million figure for value by capitalizing Mitek's actual operating income of $4.6 million by a multiplier of seven. Based on this valuation of Mitek, Bowater paid $26 million in cash for its forty-nine percent interest in the New Mitek.
16. At trial, plaintiff and defendant offered expert testimony concerning the fair value of plaintiff's stock and the fair value of Mitek as of the valuation date.
17. John Stann, the senior corporate valuations officer in A.G. Edwards & Sons' investment banking division and plaintiff's expert, testified that in his line of work, he had valued between 150 to 200 companies, with the majority of his valuations for closely-held companies the size of Mitek. Mr. Stann testified that, in his opinion, the range of value of plaintiff's stock was between $48 and $55 per share based on Mitek's financial reports and projections and techniques customarily used in corporate valuation. Mr. Stann presented three independent studies of Mitek's value as an on-going enterprise at the time of the valuation date in order to support his range of fair value figures of plaintiff's shares. In his first study, Mr. Stann used the capitalization of operating income based on comparable transactions methodology which yielded a $55 per share value of Mitek. Mr. Stann next used the discounted cash flow analysis from which he derived a fair value of $50 per share based on Mitek's reasonably expected future cash flows. In his last methodology, the market element analysis, Mr. Stann capitalized Mitek's earnings per share based on market price/earnings ratios of comparable public companies in order to arrive at the value of $48 per share. The three studies used by Mr. Stann yielded a value of Mitek, as an on-going enterprise, in the range of $48 to $55 per share, and he testified that based on his experience in valuing closely-held companies, the value range he derived from the studies reflected the fair value per share of Mitek on the valuation date.
18. Defendant's expert, Kurt Oelze, vice president in charge of the Phoenix office of Peterson & Company Consulting, testified that his experience in valuations covered the area of economic harm and damages, not corporate valuations and dissenters' rights valuations. Mr. Oelze prepared his valuation by using the discounted cash flow methodology which yielded a value of $32.78 per share of Mitek. Mr. Oelze then applied discounts of twenty-five percent for lack of marketability, and twenty percent for minority interest since Mitek is not a publicly traded company and plaintiff is a minority shareholder. After discounting the shares, Mr. Oelze determined the highest value of plaintiff's stock to be $18.02.
19. Plaintiff testified about the offers made to him by Mitek's inside stockholders beginning in April 1986 at which time Herbert McCurdy offered him $4 per share, followed by offers of $4.50 from Paul Cornelsen in July 1986, and $5 and $5.50 per share from Barry Griffin in November 1986. Plaintiff considered all of the offers and ultimately rejected all of these offers. In court, plaintiff testified he did not know what his stock was worth, but from the financial information provided to him by Mitek's inside stockholders at his request, he deduced Mitek's book value and earnings *1105 per share were steadily increasing as a result of Cornelsen's efforts. Since his equity interest in Mitek continued to increase, plaintiff testified he was content to hold his stock. After plaintiff rejected Griffin's last offer, Griffin wrote a letter to Cornelsen assessing plaintiff's attitude at that time as being the following:
From my discussions with Fred [Hunter], I believe that he feels that his shares can only continue to appreciate and that sometime in the future he will be able to cash in at an extremely handsome profit. He indicated that as the shares were purchased at such a discount he could afford to simply wait, particularly as the legend on the stock falls away in the near future and this will give him a better market even though the shareholding of MII remains basically unchanged.
20. In August 1987, plaintiff received copies of the most current accounting information, financial documents, and internal memorandum from Mitek concerning the proposed transaction between Mitek and Bowater. He was also contacted by Charles Dapron on behalf of Mitek, offering him sixty-five percent of book value, or $12 per share, or the choice to participate in the proposed merger upon the same basis as other shareholders of New Mitek. Plaintiff considered and rejected both offers. At that point in time, plaintiff viewed himself as having the options of participating in a stock swap with Bowater, receiving a fee for signing a voting trust, or working out a take-out option with Bowater as evidenced by his August 30, 1987, letter to Mitek's attorney. Mitek's attorney advised plaintiff of the potential Mitek/Gang-Nail merger and that Bowater might be interested in purchasing his stock.
21. On September 9, 1987, Bowater offered to purchase plaintiff's stock for $29.50 per share, or $1.2 million, or to exchange his shares of stock for $1 million of Bowater stock. After making a counteroffer for $35 per share to Bowater, plaintiff accepted Bowater's counter-offer to purchase all of his shares of stock for $1.25 million, or $30.80 per share. At this point in time, plaintiff realized he had the choice either to go along with the merger, to bring a suit, or to accept the Bowater offer.
22. The $31 per share offer made by Bowater was in reality an offer by Mitek, as evidenced by McCurdy testifying at trial that the scheme Mitek had devised to allow plaintiff, as a dissident shareholder, to be bought out, was the $31 offer made by Bowater. Cornelsen referred to the method devised by Mitek which would permit Mitek to buy out plaintiff as a dissident shareholder in his August 10, 1987, letter to Mitek's directors.
23. As the shareholders' meeting concerning approval of the merger of October 23 approached, Bowater pressed plaintiff for an answer to its offer. Plaintiff then sought professional advice and contacted an attorney and a valuation expert because the offer from Bowater raised suspicions in his mind as to the true value of his Mitek stock.
24. Plaintiff testified he agreed to accept the Bowater offer of $30.80 per share on October 21, 1987, provided this would be a completed and closed transaction no later than October 26, 1987. After accepting Bowater's offer, Bowater notified plaintiff that the offer was conditioned upon Bowater closing the merger transaction with Mitek and Gang-Nail. As evidenced by a letter from plaintiff to Steve Rusmisel dated October 27, 1987, confirming their earlier telephone discussions, plaintiff and Bowater agreed that no agreement had been reached for plaintiff to sell his stock since Bowater had not tendered and plaintiff had not signed any agreement relating to the sale of his Mitek shares.
25. After Mitek's shareholders voted to approve the merger, plaintiff, who had taken steps to preserve his right to bring a dissenters' rights suit, rejected Bowater's offer and refused to sign a written agreement providing for interest on the purchase price as requested by him, opting for statutory right to appraisal of the fair value of his stock.

Conclusions of Law
1. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action. *1106 Plaintiff is an individual and a citizen and resident of Dallas, Texas. New Mitek is a Florida corporation with its registered office and principal place of business in St. Louis County, Missouri. The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum for diversity jurisdiction.
2. In determining the fair value of plaintiff's shares of stock of Mitek pursuant to § 351.455 as of October 22, 1987, the date prior to the day on which a majority of Mitek's shareholders voted in favor of the merger, the Court is to consider all relevant factors. The leading case of the Missouri Supreme Court in regard to determining fair value under § 351.455 when minority shareholders object to a corporate merger held that there is no simple, mathematical formula to establish fair value, and each case presents its particular problem, but in general, some of the factors to be considered and weighed "are asset value, earnings, dividends, [and] management, and `[e]very relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of corporate stock.'" Phelps v. Watson-Stillman Co., 365 Mo. 1124, 293 S.W.2d 429, 433 (1956) (quoting Lattin, Remedies of Dissenting Stockholders under Appraisal Statutes, 45 Harv.L.Rev. 233, 262 (1931)).
3. Under Missouri law, the dissenting shareholder is entitled to his proportionate interest or pro rata share in the overall fair value of the corporation, appraised as a going concern. Dreiseszun v. FLM Indus., Inc., 577 S.W.2d 902, 908 (Mo.App.1979). Although the Dreiseszun case involved
"a determination of fair value under § 351.405 relating to the right of a dissenting shareholder in the event of a sale or exchange of all or substantially all of a corporation's assets, the court in Dreiseszun does extend the effect of its decision to all other statutes employing the term fair value. Therefore, the opinion in Dreiseszun is applicable to define fair value as used in § 351.455 relating to a merger."
King v. F.T.J., Inc., 765 S.W.2d 301, 303 (Mo.App.1988).
4. Under Missouri law, the application of either a marketability discount or a minority discount
in determining fair value pursuant to § 351.455, when a shareholder of a corporation objects to a merger or consolidation, rests within the sound discretion of the trier of fact after every relevant fact and circumstance is considered.
King, supra, at 305 and 306.
5. The expert witness testifying on behalf of Mitek, Mr. Oelze, discounted the value of plaintiff's stock to account for lack of marketability and for representing a minority interest. Mr. Oelze applied a twenty-five percent lack of marketability discount and a twenty percent minority discount to the total value of plaintiff's minority interest in calculating the fair value of his stock. Mr. Oelze testified he always used a discounted flow methodology. Plaintiff's expert, Mr. Stann, did not apply either discount, but determined the fair value of plaintiff's shares of Mitek on the enterprise basis, viewing the company as an on-going concern.
6. Fair value means on-going business value, and a dissenting shareholder is entitled to his proportional or pro rata share of the company's on-going value. Dreiseszun, supra at 907. The fundamental concept is that a "common stockholder is an owner of the enterprise in [the] proportion that his stock" bears to the entire stock "of the company, with each share being of equal value." Id. at 908. The court in Dreiseszun ruled that the trial court erred in placing "a different `fair value' per share upon the same classification and kind of stock in a corporation depending upon whether the shares were held by a majority or a minority stockholder," id. at 906, because the fair value of stock is the same, regardless of whether it is held by a majority or minority stockholder. The court further noted that § 351.455 "does not by terms or any reasonable interpretation intend that a minority stockholder be in any way penalized for resorting to the remedy afforded thereunder." Id.
7. The purpose of the appraisal statute is to award the dissenter the value *1107 of what he owned, his proportionate interest in the going concern, in exchange for giving up his control power over significant corporate changes. Flarsheim v. Twenty Five Thirty Two Broadway Corp., 432 S.W.2d 245, 252 (Mo. banc 1968). The statute was designed primarily for the protection of the dissenting shareholders and the award of fair value being the substitute for the control power or value the minority relinquished. Id. The Court declines to apply the minority and marketability discounts, and notes that such efforts to discount a dissenting shareholder's stock have been expressly rejected by a number of courts. See Cavalier Oil v. Hartnett, 1988 WL 15816, Del.Ch. LEXIS 28 at pg. 10 (Feb. 22, 1988) (minority and marketability discounts are legally immaterial in determining the corporation's fair value); Johnston v. Hickory Creek Nursery, Inc., 167 Ill.App.3d 449, 118 Ill.Dec. 168, 171-72, 521 N.E.2d 236, 239-40 (1988) ("such discounting does not apply in the instant case when a minority interest is being assumed by the remaining shareholders").
8. Furthermore, fair value is not the price that a minority shareholder, in a company whose stock is not actively traded, might be willing to accept. Dreiseszun, supra at 906. The offer made by Bowater directly parallels the offer made to and accepted by the minority shareholders in Dreiseszun. The court in Dreiseszun ruled that such an offer could not be the basis of fair value because, to hold otherwise, would impermissibly allow the majority shareholders to determine the value of the minority stock based on the price the majority shareholders are willing to pay for the minority shares. Id. Accordingly, the Court finds that the value of plaintiff's shares can be greater than the amount offered by Bowater.
9. In determining plaintiff's pro rata share of Mitek's value as an on-going business, "no simple, precise mathematical formula exists and [e]ach case presents different elements of value and each must be viewed separately." Dreiseszun, supra at 907.
10. In determining the fair value of plaintiff's stock, the Court accords weight to the valuation of Mitek at $27.1 million, or $69 per share, in connection with the Bowater/Mitek financial transaction, because this valuation bears on what the company as a whole, based on its earning power, is worth. The Court also finds that the opinion and analysis of plaintiff's expert, Mr. Stann, is entitled to substantial weight. Mr. Stann utilized techniques customary in corporate valuation when preparing the three independent studies of Mitek's value as an on-going business at the valuation date. Mr. Stann testified that the range of value of plaintiff's stock was between $48 and $55 per share, as determined by employing the standard methodologies. Each study examined Mitek's value from a different perspective, and each acted as a cross-check on the validity and correctness of the results of the other studies.
11. Defendant's expert, Mr. Oelze, presented only one study, using one methodology, and derived a pro rata share value of plaintiff's stock to be $32.78 before applying the marketability and minority discounts.
Taking into consideration all relevant evidence which bears upon the value of plaintiff's stock, and weighing these elements of value, the Court finds that the fair value of plaintiff's stock as of October 22, 1987, the valuation date, is $48 per share. Accordingly, judgment will be entered in favor of plaintiff in the principal sum of $1,948,368.00, together with prejudgment interest on such principal sum from October 23, 1987, at the rate of nine percent per annum, or $257,022.82, and post-judgment interest at the legal rate of 9.51%.