In the Matter of SAMUEL SILVERMAN et al., Appellants-Respondents. R. HOE & Co., INC., Respondent-Appellant.

First Department, June 11, 1953.

*Bernard S. Kanton* of counsel (*Maurice Fixel* with him on the brief; *Kanton & Fixel,* attorneys), for Samuel Silverman and others, appellants-respondents.

*Neil P. Cullom* of counsel (*Robert D. Cole* and *Stanford Schewel* with him on the brief; *Neil P. Cullom,* attorney), for respondent-appellant.

*George C. Baron* of counsel (*Frederick Doppelt* with him on the brief; *Booth, Baron & Doppelt,* attorneys), for Elmer M. Wood and others, appellants-respondents.

COHN, J.  This is a proceeding brought under section 21 of the Stock Corporation Law (L. 1949, ch. 805, § 9; L. 1950, ch. 647, § 1, eff. July 1, 1950) for an appraisal of the value of 66,647 shares of the common stock of R. Hoe & Co., Inc. (hereafter called Hoe), a New York corporation.  The owners of this stock dissented from a proposed plan of consolidation of Hoe with a wholly owned subsidiary, which the directors of Hoe on July 14, 1950, voted to submit to the stockholders and which the stockholders of the class " A " stock approved on September 12, 1950.  In all, there were 579 holders of the 160,000 shares of common stock outstanding.  The common stockholders were not entitled to vote on the plan of consolidation.  This right was vested solely in the holders of the class " A " stock.

The plan from which the petitioners dissented, consolidated Hoe with its wholly owned subsidiary, Hoe Export-Import Corp., a company which was organized on July 11, 1950, with nominal capital and with directors and officers who were in numerous instances officers of Hoe.  The subsidiary had never conducted any business whatever.

The corporate capitalization of Hoe before the effective date of the consolidation was as follows:  There were 95,997 shares of class " A " stock, 194,767 shares of class " B " stock, and 160,000 shares of common stock.

The " A " stock had a redemption price of $65, the right to elect nine of the eleven members of the board of directors, a $4 dividend preference, and the right to participate in dividends with the common after the latter received $1 per share (or $160,000 per year), on the basis of one third of each $1 to the " A ", but only up to $3 per share, and the common was to

receive two thirds of each $1 plus all the balance of available surplus.

The " B " stock had no voting rights. The charter provided that on or before January 15th of each year, Hoe was required to set aside, for the purpose of retiring " B " stock, a sum equal to 50% of the preceding fiscal year's net income in excess of $200,000 after " A " dividend requirements. Out of 383,988 shares of " B " issued in January, 1947, the Hoe management, pursuant to terms of the charter, had by March, 1950, retired 189,221 shares, at an average price of $9.94, though the stock carried a redemption price of $20. This left outstanding 194,767 shares of class " B " stock.

The owners of the common had the right, voting cumulatively as a class, to elect two of the eleven directors, and upon retirement of the " B " stock, were authorized to elect a majority, or six of the eleven, and to vote equally with the " A " on all other matters.

In accordance with the recapitalization plan effective with the consolidation, each class of shareholders received in exchange for each share of their old holdings the following:

Class " A " Holders...... 4 shares of new A
                                 2 shares of new common
Class " B " Holders...... $3 in cash
                                 $\frac{1}{2}$ share of new A
                                 1 share of new common
Common Stock Holders.... 1 share of new common

The new " A " stock had a redemption price of $16.25 a share, a cumulative dividend of $1 per share, and the right to elect nine of the eleven directors.

The setup of the three classes of stock before and after consolidation can best be illustrated by the following table:

| Class | Number of Shares Outstanding Before Consolidation | Number of Shares Received After Consolidation | | |
|---|---|---|---|---|
| | | " A " Stock | Common | % Common |
| " A " | 95,997 | 383,988 | 191,994 | (35.1%) |
| " B " | 194,767 | 97,383.5 | 194,767 | (35.7%) |
| Common | 160,000 | ........ | 160,000 | (29.2%) |
| Total | | 481,371.5 | 546,761 | (100 %) |

As indicated by this analysis, the interest of the original common stockholders was thus diluted by over 70%. Through the exercise of their sole voting control, stockholders of the

class " A " stock of Hoe by means of the consolidation with the wholly owned subsidiary obtained control of the major part of the ultimate equity of Hoe.

Petitioners, with holdings comprising 42% of the old common stock dissented from the plan, and made application for an appraisal, which was granted. A duly appointed appraiser, after extensive hearings, fixed the value of the stock as of September 11, 1950, at $7.50 per share. This was confirmed by the Special Term which used as its basis of valuation, quotations of the common stock in trading on the over-the-counter market. It would appear that after the announcement of the proposed plan, these quotations had discounted the drastic dilution to be suffered by the holders of the old common stock.

Petitioners contend that the value fixed by the Special Term was grossly inadequate. They point to the fact that when seeking to block the plan of consolidation they were denied relief on the ground that their sole remedy was by appraisal (*Katz* v. *Hoe & Co.*, 199 Misc. 459, 463, affd. 278 App. Div. 766, motion for leave to appeal denied 302 N. Y. 949, certiorari denied 342 U. S. 886). Having been relegated to appraisal (they now argue) their stock has been valued on the basis of market quotations which were obviously depreciated by the same plan. The net result, if the valuation set by the Special Term were to stand, they assert, would be that they would receive the market value of this new diluted common stock without any effect being given to the true value of the old common stock. Of course, on appraisal, petitioners were not entitled to a premium or a bonus, but there was a clear obligation to pay them its fair value in accordance with the mandate of the statute in such case provided. The fifth sentence of subdivision 4 of section 21 of the Stock Corporation Law states: " For all the purposes of this section, such value shall be determined as of the close of business on the day before the taking of the stockholders' vote on the action to which objection was made, excluding any appreciation or depreciation directly or indirectly consequent upon such action or the proposal thereof."

The value of the stock is to be taken at the close of business on the day before the vote. Any appreciation or depreciation directly or indirectly consequent on the proposal must be excluded. The statute also specifically provides that if the court is not satisfied with the appraiser's report it may in its discretion determine the value of the stock of the objecting stockholders in the light of all the relevant legal evidence (Stock Corporation Law, § 21, subd. 4).

We do not concur in the view expressed by the Special Term, that an arithmetical average of " bid " quotations of the common stock on the over-the-counter market for a period of two years prior to the time of the vote should be the determining factor in the evaluating process. Market value has been the controlling consideration where there is a free and open market on a recognized stock exchange and the volume of transactions and conditions make it a fair reflection of the judgment of the buying and selling public (*Matter of Marcus* [*Macy & Co.*], 273 App. Div. 725, 727; *Matter of Deutschmann* [*American Tel. & Tel. Co.*], 281 App. Div. 14, 19; *Matter of Behrens,* 61 N. Y. S. 2d 179, 182, affd. *sub nom. Matter of Standard Coated Products Corp.* [*Behrens*], 271 App. Div. 1007). However, in the circumstances of this case market price of the stock so far as it is possible to ascertain it, should not be the sole criterion of value. The shares of common stock of Hoe were not listed on any exchange. They were bought and sold on the over-the-counter market. There is a marked difference between the reliability of market price as a guide to value in respect of a stock listed on a recognized exchange and one traded over the counter. Insofar as listed stocks are concerned, volume and prices of actual sales, including short sales, are matters of public record and subject to exchange regulation and control. On the other hand, over-the-counter transactions are not recorded nor subject to any regulation or control. Though there was a fairly active over-the-counter market for the common stock of Hoe, it is difficult to determine the prices for which actual sales were made for there was no record of the prices at which stock was sold. The only records available are the " bid " prices for the stock. A wide spread exists between " bid " and " asked " prices. Indeed, some testimony showed that it was at times as great as a full point in this stock.

On May 24, 1950, public announcement was made by the directors of Hoe that no plan was contemplated; June 28th of the same year Hoe's directors voted to refer the proposed plan to a committee for study, which ultimately resulted in its adoption by the board of directors on July 14th; July 17th was the first trading day after public announcement was made that the directors approved the plan. Accordingly, in the particular facts and circumstances here presented, the period from May 24th to June 27th would appear to present a fair reflection of market appraisal unaffected by the plan. Though there was a break in general market conditions resulting from the Korean

War during this period, it apparently had little effect upon this stock. Petitioners call attention to the fact that on May 24th, the day on which the president of Hoe publicly announced that there was no immediate prospect of a plan of reorganization, the " bid " price was 10⅝. Allowing a spread of one point, the " asked " price would be somewhat higher, and the mean between the " bid " and " asked " prices of the common stock would therefore be approximately 11. On June 28th, when the Hoe directors voted to refer the proposed plan to a committee, the approximate mean price of the stock was 10 and on July 14th, when it was announced to the public that the board of directors approved the plan later adopted by the stockholders, the approximate mean was down to 8¾, and on the next market day it dropped to 6¼. There can be little doubt that the announcement of the plan's approval adversely affected the market for the stock. The bid price of $7 per share on September 11, 1950, the day before the stockholders approved the plan, represented not the market value of the old common stock excluding any depreciation directly or indirectly consequent upon the approval of the plan, but that of the new common stock which was to be issued.

The legal principles which should be applied in fixing the value of the common stock of Hoe are concisely set forth in *Matter of Behrens* (61 N. Y. S. 2d 179, affd. 271 App. Div. 1007) in an opinion by PECK, J., now Presiding Justice, on page 182, as follows: " While there is no legal formula which can be enunciated or applied in valuation proceedings, the appraisal remaining a matter of judgment on the facts in each case, the Court can reiterate accepted principles which, simply stated, are that the appraisal should take account of market value, investment value, and net asset value. Matter of Fulton, 257 N. Y. 487, 494, 495. * * * The weight to be attached to each factor will naturally vary in accordance with the facts of each case, but appraisers should take account of all these factors, and should not exclude any one from consideration in favor of placing complete reliance upon any other."

For reasons heretofore stated, " bid " prices as recorded on the over-the-counter market and probable " asked " quotes are not controlling. (*Matter of Behrens, supra,* p. 183.) In any event, the recorded " bid " prices of common stock when there was no immediate prospect of a plan should receive much greater consideration than the " bid " prices thereafter listed, while the directors were considering and finally adopting the proposed plan.

Weight here must also be given to investment value. In his report the appraiser correctly observed that Hoe is known as an outstanding manufacturer of large newspaper and magazine presses, and other kindred metal products; that it is well managed, financially sound and long established; that it has maintained a pre-eminent position in the industry; and that it has a record throughout the years of making constant progress in improving newspaper presses. The average annual earnings of Hoe during the five-year period from 1946 to 1950 were approximately $1,500,000. Prospects for future years were not unfavorable. When the old " B " stock was to be fully retired, which in the normal course of events would have occurred in about three years, substantial dividends might thereafter have been paid on the common. Petitioners maintain that on the basis of corporate profits of $1,800,000 annually for the five-year period through 1950, the earnings on the common stock would be about $8.85 per share, and that taking all relevant factors into consideration the value of the old common stock should be in excess of $19 per share. While the view thus expressed might be somewhat optimistic, the excellent earning record of the company, its position in the industry, and its future prospects are all factors that may properly be calculated.

In *Matter of Fulton* (257 N. Y. 487) it was stated that in appraisal proceedings involving dissenting stockholders the stock must be evaluated as though it were a continuing interest in the corporation as a going concern. The court there stated (p. 494):

" The payment of such actual value, even if more than the market quotation, is the price that must be paid by the corporation for the privilege of requiring a sale over the protest of the dissenting stockholders who in effect are being ousted from the corporation.

" The purpose of the statute being to save the dissenting stockholder from loss by reason of the change in the nature of the business, he is entitled to receive the value of his stock for sale or its value for investment."

In *Consolidated Rock Co.* v. *Du Bois* (312 U. S. 510, 526, 527) the court said: " The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. *In re Wickwire Spencer Steel Co.*, 12 F. Supp. 528, 533; 2 Bonbright, Valuation of Property, pp. 870–881, 884–893."

In *Dudley* v. *Mealey* (147 F. 2d 268, 270), it was declared: " The Supreme Court has several times said that the best test of the value of a going commercial enterprise is its earning capacity. Galveston H. & S. R. Co. v. Texas, 210 U. S. 217, 226 * * * ; Consolidated Rock Products Co. v. DuBois, 312 U. S. 510, 525, 526 * * * ; Group of Institutional Investors v. Chicago, M. St. P. & P. R. Co., 318 U. S. 523, 540 ". (See, also, *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448, 483.)

As to asset value, the appraiser found that there were no earnings available for the common stock, and that it had no value on an asset basis on September 11, 1950; that no dividends had ever been paid on the common stock and none could be paid on that date; that they would be available only upon the elimination of $3,900,000 worth of the senior " B " stock. However, that finding by the appraiser is seriously disputed by petitioners who contend that no thought was given to extremely valuable patents carried at only $1 and to vast amounts of equipment and facilities in full use carried at zero because they were fully depreciated. In any event, we think that in this case the asset value, in view of the current excellent earnings of the company, and its future prospects was not of too much significance. Net asset value should not be the basis of determining the value of the stock of a great industrial like Hoe, as a going concern. As was stated in *Matter of Marcus (Macy & Co.)* (273 App. Div. 725, 728, 729) : " In the first place, whatever consideration and weight might properly be given to net asset value under certain circumstances, it is clear that net asset value is not the basis, if it is any substantial consideration, in determining the value of the stock of a department store or other industrial as a going concern. The assets are committed to the operation of the business, and inventories are constantly shifting by the process of sale and replacement, and any number of factors besides the naked value of physical assets will determine the success or failure of operations and consequent value, above or below net asset value, of the business."

Prospects for the future of this company were bright, its business was excellent, and there was good reason to believe that the average earnings for the preceding five years would be continued thereafter.

Petitioners also point out that a plan dated March 15, 1950, prepared by the chairman of the board of directors of Hoe and its counsel, proposed to issue option warrants to the common stockholders to purchase the new common stock at a price of

$12 per share. Though the plan as finally adopted omitted the option warrants, petitioners argue that this estimate of the value of the new common stock even after its dilution is indicative of the fact that Hoe itself believed the old common stock to be worth at least $12 per share.

The appraisal of stock in each of such proceedings must rest on its own particular facts. Herein, in view of the many intangible factors which must necessarily play a part in fixing the fair value of the stock, its value cannot be determined with mathematical exactitude. As so effectively stated by Presiding Justice PECK in his lucid opinion in *Matter of Behrens (supra,* p. 183) : '' Besides market value and net asset value, there is investment value, which is not subject to nice definition or determination, but takes account of such factors as the capitalization of the company, earnings and dividend record, position in the industry, prospects of the business and the industry, and the over-all value of its securities in relation to general market conditions and the market values of comparable securities.''

According due weight to evidence as to what was the ascertainable market value of the stock as it existed when public announcement by the president of Hoe was made that there was no immediate prospect of a plan of reorganization, and keeping in mind its investment value as reflected in the excellent earnings over a five-year period, the bright future prospects of this going concern, the reasonable expectation that the remaining '' B '' stock would shortly have been retired ultimately giving control of the company to the old common stockholders and thus affording them an opportunity of sharing in the company's earnings, and being mindful of the fact, too, that a plan dated March 15, 1950, proposed by the chairman of the board of directors of the company offered to issue option warrants to common stockholders to purchase new common stock at a starting price of $12 per share, we are of the opinion that the value of this stock as of the close of business on the day before the taking of the stockholders' vote, excluding any appreciation or depreciation directly or indirectly consequent upon such action was $10 per share.

With respect to Hoe's cross appeal, subdivision 5 of section 21 of the Stock Corporation Law (as amd. in 1950) provides: '' The costs and expenses of the proceedings shall be determined by the court and shall be assessed against the corporation; provided, that all or any part of such costs and expenses may be apportioned and assessed as the court may deem equitable

against any or all of the objecting stockholder parties to the proceeding to whom the corporation shall have made an offer to pay for the stock if, * * * the court shall find that the action of such stockholders in failing to accept such offer was arbitrary and vexatious or not in good faith.'' This is not a case where a few arbitrary dissenters are acting in bad faith in failing to accept an offer of the company to pay for their stock. On the contrary, the corporation here did not make any offer to the dissenters by which the shares could be surrendered to the corporation at a fair value. Therefore, petitioners were forced to apply for an appraisal and each petitioner had to file a separate petition for which each is entitled to $10 motion costs. Subdivision 5 of section 21 of the Stock Corporation Law, as amended in 1950, clearly authorizes the imposition of such costs. The charge against the corporation of the expense of a stenographic transcript of the testimony was also proper. Such items are contemplated in section 21. There is no merit to respondent's contentions to the contrary.

Accordingly, the order of the Special Term should be modified by fixing the value of the common stock of petitioners, as of September 11, 1950, at $10 per share. Settle order.

PECK, P. J., GLENNON, DORE and BREITEL, JJ., concur. ·

Order unanimously modified by fixing the value of the common stock of petitioners, as of September 11, 1950, at $10 per share and, as so modified, affirmed. Settle order on notice.