63 P.3d 288

**PRO FINISH USA, LTD., an Arizona Corporation, Plaintiff–Appellant,**

**v.**

**Ronald James JOHNSON and Jennifer J. Johnson, husband and wife, individually and as Trustees of the Ronald James and Jennifer J. Johnson Family Trust Dated August 25, 1995; the Ronald James and Jennifer J. Johnson Family Trust Dated August 25, 1995; and Virginia Dayton, a single woman, Defendants–Appellees.**

**No. 1 CA–CV 02–0091.**

Court of Appeals of Arizona, Division 1, Department C.

Feb. 6, 2003.

As Amended Feb. 21, 2003.

Review Denied June 30, 2003.

---

Jones, Skelton & Hochuli, P.L.C., By William D. Holm, and Randall H. Warner, Phoenix, for Plaintiff–Appellant.

Schmitt, Schneck, Smyth & Herrod, P.C., By Stephen G. Smyth, Phoenix, for Defendants–Appellees.

## OPINION

LANKFORD, Judge.

¶ 1 This appeal requires that we determine how courts should decide the "fair value" of the stock of minority shareholders who dissent from a closely held corporation's sale of its assets. Central to our determination is this question: May the sale price of the assets be considered?

¶ 2 The corporation, Pro Finish USA, Ltd., appeals from the superior court's determination of the fair value of the shares held by the dissenting minority shareholders and its award of attorneys' fees and expenses to them. We affirm the superior court's judgment as to fair value, but vacate its award of fees and expenses.

¶ 3 The facts are as follows. In May 1998, a buyer agreed to pay $5 million in cash, payable at one time, for substantially all of the corporation's assets. The buyer also agreed to assume virtually all of the corporate liabilities of about $1 million.[1] At the time, the corporation sold nail care polishes and finishes and other personal care products.

¶ 4 At a special meeting of shareholders to approve the sale, the dissenting shareholders, who collectively owned 86.95 shares, voted against it. They then exercised their rights under Arizona law to have their shares purchased by the corporation at fair value. Because the corporation was closely held, however, stock market quotations were unavailable and no public market existed; consequently, the fair value of the stock could not be readily ascertained. The corporation initially set fair value at $1200 per share and paid that sum, plus interest, to the shareholders. When the shareholders objected, the corporation filed this action for an appraisal pursuant to Arizona Revised Statutes ("A.R.S.") section 10–1330 (1996).[2]

¶ 5 Although both sides retained experts to value the shares, the appraisers' methods differed greatly. The shareholders' expert, Stephen K. Clarke,[3] arrived at a fair value of $2504.64 per share, basing his calculations on the asset sale price. In sharp contrast, the corporation's expert, James A. Larson,[4] calculated fair value as $977 per share by discounting the payment stream to present value and comparing that figure to the price per share in a previous minority shareholder stock sale. The superior court accepted Clarke's determination of fair value and entered judgment accordingly. The corporation's motion for new trial was denied, and it now timely appeals.

¶ 6 The appeal presents two issues. First, the corporation contends that Clarke's methodology was flawed and that the superior court should have accepted Larson's valuation instead. Second, the corporation argues that the superior court erred in awarding

---

1. The corporation's assets and liabilities were valued as of April 30, 1998, in accordance with the corporation's balance sheet as of that date.

2. A.R.S. § 10–1330(A) provides:

    If a demand for payment under [A.R.S.] § 10–1328 remains unsettled, the corporation shall commence a proceeding within sixty days after receiving the payment demand and shall petition the court to determine the fair value of the shares and accrued interest. If the corporation does not commence the proceeding within the sixty day period, it shall pay each dissenter whose demand remains unsettled the amount demanded.

3. Clarke had more than twenty-one years of experience in business valuation. In addition to being a Certified Public Accountant and its equivalent in the United Kingdom, a Chartered Accountant, Clarke had an ABV (accredited in business valuation) certification from the American Institute of Certified Public Accountants. He had appraised or assessed business values between one thousand and two thousand times and had testified as an expert witness regarding business valuation in federal and state courts in Arizona and California and in the Crown Court of England.

4. Larson had been engaged in business valuation for eight years, but only two of them full time, and had appraised slightly more than fifty businesses. His educational background was in mathematics and business administration.

attorneys' fees, expenses, and expert witness fees to the shareholders. We have jurisdiction pursuant to A.R.S. §§ 12–2101(B) and (F)(1) (1994).

■ ¶ 7 Whether the superior court properly applied the statutory fair value standard to the facts of this case is a mixed question of law and fact that we review de novo. *Enter. Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 148, ¶ 11, 3 P.3d 1064, 1068 (App.1999) ("[W]e are not constrained by the legal conclusions from facts found or inferred in the judgment of the trial court nor by findings of the trial court in questions of law or mixed questions of law and fact."). No reported Arizona case has considered how to ascertain fair value pursuant to the statutory requirement to pay fair value for a dissenter's shares. Other jurisdictions have not uniformly resolved this question. *See* Barry M. Wertheimer, *The Shareholder's Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613 (1998) (hereafter cited as "Wertheimer"); James H. Eggart, *Replacing the Sword with a Scalpel: The Case for a Bright–Line Rule Disallowing the Application of Lack of Marketability Discounts in Shareholder Oppression Cases*, 44 Ariz. L.Rev. 213 (2002) (hereafter cited as "Eggart").

¶ 8 The dissenting shareholders' rights are governed by Arizona statutes. These statutes derive from the Model Business Corporation Act as it existed when Arizona's statutes were enacted by Laws 1994, Ch. 223, § 4, eff. Jan. 1, 1996.[5] A.R.S. § 10–1302(A)(3) (1996) [6] permits a shareholder to dissent from specific corporate acts, including the sale of all or substantially all of the corporate property other than in the ordinary course of business.[7] The asset sale involved here is such a transaction.

¶ 9 When shareholders dissent, the corporation is statutorily required to pay the dissenting shareholders the "fair value" of their shares. A.R.S. §§ 10–1325(A) (1996) [8]; 10–1330(A). " 'Fair value' . . . means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion is inequitable." A.R.S. § 10–1301(4) (1996).

■ ¶ 10 We first consider whether Arizona law requires fair value to be determined independent of the asset sale. The corporation contends that fair value cannot be based on the asset sale because it would constitute consideration of "appreciation . . . in anticipation of" the asset sale contrary to the statutory definition of fair value.

¶ 11 Our statutes contain no blanket prohibition against considering appreciation. In fact, the statute allows appreciation or depreciation to be considered if it would be "inequitable" not to do so. A.R.S. § 10–1301(4). Thus, the corporation's interpretation of the statute is incorrect, and it makes no persuasive case that the equities required that the court disregard appreciation.

¶ 12 Even if appreciation could not be considered, however, the asset sale did not cause

---

5. Amendments to the Model Act reflected in the current version have not been enacted in Arizona. *See* Model Business Corporation Act Ann., Ch. 13, Dissenters' Rights (3d ed. Supp.1999).

6. A.R.S. § 10–1302(A)(3) provides:
   Consummation of a sale or exchange of all or substantially all of the property of the corporation other than in the usual and regular course of business, if the shareholder is entitled to vote on the sale or exchange, including a sale in dissolution, but not including a sale pursuant to a court order or a sale for cash pursuant to a plan by which all or substantially all of the net proceeds of the sale will be distributed to the shareholders within one year after the date of sale.

7. The statutory system of dissent, appraisal, and buyout provides an escape for minority share-

holders from merger transactions that fundamentally change the structure of their corporation. *See* Wertheimer, 47 Duke L.J. at 614–15. The statutes also protect minority shareholders who are cashed out of their investment by "cash-out mergers" or by asset sales such as this one. *See id.* at 615–16.

8. A.R.S. § 10–1325(A) provides in relevant part:
   [A]s soon as the proposed corporate action is taken, or if such action is taken without a shareholder vote, on receipt of a payment demand, the corporation shall pay each dissenter who complied with [A.R.S.] § 10–1323 the amount the corporation estimates to be the fair value of the dissenter's shares plus accrued interest.

an appreciation in the stock value that could be excluded. Excluding third-party sales value "is not consistent with the purpose of the statutory language, ... with economic realities, and it is certainly not compelled as a matter of statutory interpretation." Wertheimer, 47 Duke L.J. at 659. The common-sense answer to the question of an asset's value is what a third-party is willing to pay for it. *See id.* at 658–62. Methods of valuation short of third-party sales value are "guesswork" and "merely a second best substitute for valuing the property in an actual third party sale." *Id.* at 654–55. Thus, "[t]he best evidence of value, if available, is third-party sales value," and reliable evidence of third-party sales should be considered in determining fair value. *Id.* at 655, 671–75; *see Hunter v. Mitek Indus., Inc.,* 721 F.Supp. 1102, 1107 (E.D.Mo.1989) (giving weight to stock sale price); *Hernando Bank v. Huff,* 609 F.Supp. 1124, 1126 (N.D.Miss. 1985), *aff'd,* 796 F.2d 803 (5th Cir.1986) (purchase offers "have particular relevance"); *Knight v. Pine Island Fruit Corp.,* 445 So.2d 684, 685 (Fla.App.1984) (asset sale price). This is not mere evidence of appreciation caused only by the sale, but the best evidence of the value of what was sold. Third-party sales, therefore, should not be automatically excluded from a fair value calculation.

¶ 13 This position finds further support from other respected authority, namely the *Principles of Corporate Governance: Analysis and Recommendations* (1994) (*"Principles"*), a comprehensive study by the American Law Institute that qualifies for the deference we grant to the Restatements. *See AMERCO v. Shoen,* 184 Ariz. 150, 155, 907 P.2d 536, 541 (App.1995) (adopting *Principles* for use in Arizona). Section 7.22 of the *Principles* sets forth the standards for determining fair value in appraisal rights proceedings, and subsection (b) states that, except for circumstances not present here, "the aggregate price accepted by the board of directors of the subject corporation should be presumed to represent the fair value of the corporation, or of the assets sold in the case of an asset sale, unless the [opposing party] can prove otherwise by clear and convincing evidence."

Comment c to § 7.22 explains that "management generally has every incentive to obtain the highest possible price in a true arm's-length transaction." The more recent version of the Model Act regarding dissenters' rights also adopts the view that the price accepted by the board of directors of the subject corporation should be presumed to represent the fair value of the corporation or of assets sold, absent clear and convincing evidence otherwise. § 13.01, cmt. 2 (3d ed. Supp.1999). We therefore adopt this approach in Arizona.

¶ 14 The third-party sale price is therefore not precluded as a value inflated by the sale. The statute bars from inclusion in value "any appreciation ... in anticipation of the corporate action" unless fairness requires otherwise. A.R.S. § 10–1301(4). As Clarke testified, the agreement to buy the assets did not cause those assets to increase in value; rather, the sale was simply the best evidence of an existing value.

¶ 15 Moreover, the risk of appreciated value is implicated by a stock-for-stock merger, not a cash-out merger or asset sale such as this one. In a stock merger, the dissenting shareholder declines to participate in the merged entry, and accordingly is denied benefits deriving solely from the merger, including appreciation in the stock in anticipation of its increased value as part of the merged entity. *See Wertheimer,* 47 Duke L.J. at 659–60. But in a cash transaction, the dissenting shareholders obtain no benefit from any anticipated increase in stock value from the synergy of a stock merger, because there will be no merger. Instead, the shareholders receive cash, representing the fair value of the pre-merger stock or assets sold.

¶ 16 The corporation nevertheless argues that the price may reflect an inflated value due to the buyer's unique circumstances, and the dissenters are not entitled to benefit. However, the fact that the corporation obtained a favorable price for its assets is no reason to deprive the dissenters of their pro rata share. Ownership of stock carries with it the right to a proportionate share. *See In re Appraisal of Shell Oil Co.,* 607 A.2d 1213, 1218 (Del.1992); *Cavalier Oil Corp. v. Har-*

*nett,* 564 A.2d 1137, 1144 (Del.1989); *see also* 18A Am.Jur.2d *Corporations* § 749 (1985) (each share represents a "distinct and undivided" interest in the corporation's property). The dissenter buyout system, with its standard of fair value, contemplates that dissenters may elect to realize their pro rata share of the whole corporate value. This transaction was a sale of assets at present value for cash and carried no future risk. We see no reason why all shareholders should not share in the fruit of an advantageous price for the corporate assets.

¶ 17 The corporation rests its appreciation argument largely on *Oakridge Energy, Inc. v. Clifton,* 937 P.2d 130 (Ut.1997). *Oakridge* involved a stock appraisal proceeding requiring application of a fair value statute identical to our own. The court declined to consider the sale price in a transaction in which the corporation sold substantially all of its assets. The court apparently believed that the corporation's decision to sell its assets had caused those assets to appreciate as evidenced by the difference between the price paid and the company's pre-sale valuation of the assets. According to the *Oakridge* court, this suggested the buyer paid for a "unique" value greater than a realistic value, and the court reasoned that fair value for dissenters should not be measured by any "unique" benefit that would accrue to the acquiring corporation. 937 P.2d at 133–35.

¶ 18 *Oakridge* adopts "a flawed perspective of the purpose of the appraisal remedy." Randall M. Larsen, *"Fair" Value?—The Utah Supreme Court Appraises Fair Value for Minority Shareholders Under the Appraisal Remedy: Oakridge Energy, Inc. v. Clifton,* 1999 Utah L.Rev. 823, 849 (1999); *see also Wertheimer,* 47 Duke L.J. at 660 n. 222, 661 n. 224 (describing *Oakridge* opinion as "outdated reasoning"). We cannot agree that an asset appreciates in value simply because a willing buyer offers more for it in an arm's-length transaction than the seller believed it was worth.

¶ 19 By focusing upon a perceived "unique" benefit from the assets to the acquiring corporation, the *Oakridge* court also confused the consequences of a merger with the consequences of an asset sale. Because the two differ markedly, this error is critical. A merger maintains the operating business of the corporation as part of the surviving entity, and the merged corporation's shareholders continue as owners of the surviving entity. In contrast, following an asset sale the corporation ceases to operate in its previous form and has no ongoing connection to the asset purchaser. Thus, in an asset sale, the shareholders will not participate in whatever "unique" value the asset purchaser may glean from the acquired assets. Therefore, if an asset sale is at arm's length, we see no reason to deny the dissenters' full shares in a favorable sale price.

¶ 20 Nor can we reject the superior court's valuation for failure to apply discounts to the dissenting shareholders' fair value. These discounts are for the minority's lack of control and for the limited marketability of the shares of a closely held corporation. The corporation does not argue directly that the discounts inherent in Larson's appraisal are justified. But by urging us to accept his appraisal, the corporation in effect urges us to accept his methodology, which included discounts. Larson adopted as the benchmark for his appraisal the 1997 sale by a minority shareholder. He characterized the transaction as the sale of a minority interest in a closely held company without a market for its shares, thus incorporating both a minority discount and a non-marketability discount.

[3] ¶ 21 The superior court correctly decided that minority and marketability discounts should not be applied. In determining fair value, the focus is upon the value of the firm as a whole, and that value should be "prorated equally in the appraisal process." *Principles,* § 7.22(a), cmt. e; *see also Wertheimer,* 47 Duke L.J. at 617–18, 641–54 (reviewing the authorities and arguing against discounts). The value of the dissenters' proportionate interest is to be determined "without any discount for minority status or, absent extraordinary circumstances, lack of marketability." *Principles,* § 7.22(a). Most courts decline to discount share value " 'on the ground that the shares are a minority interest or on the related grounds of a lack of liquidity or marketability.' " *See Lawson*

*Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 734 A.2d 738, 748 (1999) (quoting *1 John R. MacKay II, New Jersey Business Corporations,* ¶¶ 9–10(c)(2) (2d ed.1996)) (referring to majority of jurisdictions); *Eggart,* 44 Ariz. L.Rev. at 222 ("A number of state courts have followed Delaware's lead in altogether disallowing the consideration of lack of marketability discounts in appraisals pursuant to dissenters' rights proceedings."). Any contrary rule confers a windfall upon majority shareholders. *See Cavalier Oil Corp.,* 564 A.2d at 1145; *see also Eggart,* 44 Ariz. L.Rev. at 243 (lack of marketability discounts may result in undercompensation of shareholders in close corporations). The dissenting shareholders instead "must receive a pro rata share of the value of the corporation." *Wertheimer,* 47 Duke L.J. at 644; *see Eggart,* 44 Ariz. L.Rev. at 218 ("Generally courts have defined fair value in the context of a buyout as 'the pro rata share of the corporation as a going concern.' "). (Citation omitted). Therefore, the court correctly valued the stock without either minority or marketability discounts.

¶ 22 In sum, the price negotiated by corporate management in a third-party arm's length transaction can reflect the fair value of the corporation's assets. The superior court employed an appropriate method for valuing the stock by reference to the asset sale and without applying minority or marketability discounts.

■ ¶ 23 We next consider whether the court erroneously disregarded certain additional liabilities or miscounted the shares. The corporation contends that the court erred by failing to account for all relevant liabilities in determining fair value and by using the wrong number of shares in its calculation.[9] On appeal, we do not reweigh

conflicting evidence; we examine the record only to determine whether substantial evidence exists to support the superior court's action. *In re Estate of Pouser,* 193 Ariz. 574, 579, ¶ 13, 975 P.2d 704, 709 (1999). Substantial evidence is evidence that would permit a reasonable person to reach the court's result. *Id.* We give due regard to the opportunity of the superior court to judge the credibility of witnesses and set aside findings of fact only when they are clearly erroneous. *In re Estate of Zaritsky,* 198 Ariz. 599, 601, ¶ 5, 12 P.3d 1203, 1205 (App.2000).

¶ 24 We first consider the additional liabilities. The Asset Purchase Agreement obligated the buyer to assume certain liabilities shown on the corporation's April 30, 1998 balance sheet ("balance sheet") and certain others incurred by the corporation between the date of the balance sheet and the closing date. Liabilities not assumed by the buyer ("retained liabilities") remained obligations of the corporation. The corporation contends the court should have considered as liabilities the retained liabilities, the so-called Exhibit 17 liabilities, employment agreements, and its 1998 tax liability. However, Clarke testified that the only liabilities appropriately deducted from the sales proceeds before calculating value were the retained liabilities, the 1998 corporate income taxes, and the corporation's liability for the buyout of one employment contract.

¶ 25 The Exhibit 17 liabilities are listed in trial Exhibit 17. These items, totaling $678,067.64, were not included in the balance sheet. However, the corporation contends they should have been deducted from the sales proceeds in calculating fair value.[10] Although the corporation had control of the records, it provided almost no documentation

---

9. The superior court's findings do not specifically refer to these matters. However, we imply any findings necessary to sustain a judgment. *See In re Adoption of Holman,* 80 Ariz. 201, 208, 295 P.2d 372, 376 (1956) (findings necessary to sustain judgment, in addition to express findings, are implied in every judgment if reasonably supported by evidence and not in conflict with express findings).

10. The shareholders contend that Exhibit 17 was a demonstrative exhibit only and was not admitted in evidence. The record shows otherwise.

The minute entry for the trial on April 19, 2001, shows that Exhibit 17 was stipulated into evidence along with other exhibits. As we read the portion of the transcript cited by the shareholders, it appears Exhibit 17 was admitted in error and had been *intended* to be a demonstrative exhibit only. However, the exhibit was not withdrawn when the error was discovered. Exhibit 17 is contained in the record on appeal and is marked as having been admitted in evidence on April 19, 2001.

supporting these additional claimed liabilities. The only documentation other than Exhibit 17 was a printed list of some items attached to the exhibit, with some handwritten notations, which purported to have come from a check register of disbursements.

¶ 26 The only other support was R.E. Smith's testimony that all of the Exhibit 17 items existed as liabilities before the asset sale. Smith was not a disinterested witness. As the corporation's majority shareholder, he stood to benefit most from deducting additional liabilities. Each deduction would lower the amount the corporation had to pay to the shareholders and thereby increase the corporation's cash assets and the value of Smith's shares.

¶ 27 Smith's testimony and the nature of some of the claimed additional liabilities raised doubts about the verity of Exhibit 17. Smith claimed the $5 million asset purchase cash price had to be adjusted downward at closing to account for some assets that could not be located and because the corporation made a purchase adjustment at closing of $19,817.32. However, the corporation did not report this adjustment on its 1998 tax return as a reduction in the sales proceeds and it cites no provision of the Asset Purchase Agreement that contemplated such an adjustment.

¶ 28 Moreover, some of these liabilities had already been deducted. Of the notes payable shown on Exhibit 17, four had been listed on the balance sheet as retained liabilities. Thus, Clarke had already deducted these liabilities from the sales proceeds in his fair value calculation.

¶ 29 The corporation also claimed liabilities that Smith conceded were improper and therefore were appropriately not deducted. Smith conceded at trial that the accounts payable for office supplies, travel and telephone listed on Exhibit 17 were improper deductions because they were incurred after the applicable date. The other accounts payable on Exhibit 17 were assumed by the buyer regardless of their time of accrual.

The buyer had also agreed to pay up to $50,000 for the corporation's legal expenses, another Exhibit 17 expense item. Clarke declined to deduct these items and the court properly agreed.

¶ 30 Additionally, Exhibit 17 included accrued payroll and bonuses that did not appear on the balance sheet. Although Smith testified the bonuses were necessary to keep two key employees during the time the asset purchase was being implemented, Clarke pointed out that if the bonuses had been promised before April 30, 1998, they should have appeared as liabilities on the balance sheet. As the shareholders argue, no legitimate purpose was demonstrated for promising such substantial bonuses *after* April 30, 1998, to buy "loyalty" during the brief period between the effective date of the agreement, May 1, 1998, and its closing date, May 22, 1998.

¶ 31 Finally, Exhibit 17 also listed a note payable to Smith for $130,000 that related to a royalty dispute. Smith testified that the Asset Purchase Agreement required the corporation to resolve this dispute and that the liability did not show up on the balance sheet, but was "booked later." However, Smith's testimony as to the timing of this alleged additional liability was inconsistent with other evidence in the record. The corporation's directors held a special meeting on April 27, 1998, at which the corporation approved an agreement dated April 28, 1998, settling the dispute and calling for a settlement payment of $130,000. The Asset Purchase Agreement required all amounts owing to be paid as a condition precedent to closing and describes the dispute as having been settled on April 28, 1998. The corporation's purported liability on account of this settlement was therefore fixed before April 30, 1998, and should have been "booked" as of that date.[11] Because it was not, it was not clear error for the court to exclude that amount from the liabilities.

¶ 32 The superior court apparently found that the corporation failed to meet its burden

---

11. Clarke testified he had disregarded a $130,000 liability on the balance sheet because he never found any indication it had actually been paid. The corporation's counsel raised this issue with Clarke at trial but offered no evidence to show that $130,000 had in fact been paid as a legitimate obligation of the corporation existing on April 30, 1998.

of proof. *See Healey v. Coury*, 162 Ariz. 349, 355, 783 P.2d 795, 801 (App.1989) (no evidence as to operating expenses, income and profits). Given the lack of documentary support and the court's prerogative to reject Smith's testimony as not credible, its rejection of the corporation's contention was not clearly erroneous.

¶ 33 We next address the employment agreements, additional liabilities the corporation alleges should have been deducted. The corporation contends that the court erred by not deducting any liability for the Smith contract and that the amount of liability for the Kittleson contract should have been calculated at a five-year buyout period instead of two. Prior to the asset sale, both employees had five-year employment contracts that were automatically renewed each year for an additional five-year term. Each contract had a buyout provision obligating the corporation to pay full salary and benefits for two years after either employee elected to terminate his employment. The asset buyer neither acquired the employment agreements of either Kittleson or Smith nor assumed any liability in connection with those agreements. The superior court accepted Clarke's calculation, which allowed no liability deduction for the Smith contract and deducted a liability for a two-year buyout of the Kittleson contract. On appeal, the corporation contends this constitutes clear error.

¶ 34 We first consider whether the court erred in failing to deduct any liability for the Smith agreement. The corporation contends that the liability should have been deducted because it was obligated to employ Smith for another five years. Clarke, however, testified there was no need to incur a liability to buy out the Smith contract because the corporation continued to operate businesses with Smith as an employee. It was not clear error for the court to reject as a liability a buyout that did not occur.

¶ 35 We next consider Kittleson's agreement. In contrast to Smith, Kittleson left his employment to work for the buyer, thereby triggering the buyout.[12] Kittleson had

been employed as president and owned 320.49 shares of stock. On the closing date of the Asset Purchase Agreement, the corporation and Kittleson entered into a Stock Redemption Agreement to pay Kittleson $1,083,019 for his shares, and Kittleson agreed to waive any further compensation or benefits due under his employment contract and resigned. The corporation then consulted its accountants, KPMG, to determine the appropriate accounting for this transaction. KPMG determined that a portion of the stock redemption payment to Kittleson should be characterized as a buyout of his employment contract to reflect the "economic realities" of the transaction. KPMG chose the two-year buyout period as the value of Kittleson's contract and arrived at the payoff of $366,666 by reducing to present value the payments owed to Kittleson over a two-year period. The remainder of the payment was allocated to the stock redemption. As KPMG pointed out, the corporation would gain no tax benefit from the redemption, but retiring the employment contract liability would be a tax-deductible expense. The corporation therefore benefitted by allocating part of the total payment to a deductible expense.

¶ 36 The superior court's rejection of the five-year buyout was not clearly erroneous. Kittleson elected to terminate his employment to accept employment with the buyer. Thus, the obligation to Kittleson was for two years. We cannot fault the court for accepting the two-year buyout recommended by the corporation's own accountants and accepted by it for internal accounting.

¶ 37 We now turn our attention to the third type of additional liability: the corporation's 1998 tax liability. The corporation argues that its 1998 tax liability was undervalued. The alleged error occurred in the treatment of a net operating loss ("NOL") carryover. Smith testified that a predecessor corporation, which he had solely owned, had emerged from bankruptcy as a "shell" corporation with a substantial NOL that could be carried forward to reduce future

---

12. We note that Kittleson's departure was a direct result of the asset sale because the Asset Purchase Agreement provided as conditions of closing that Kittleson's contract with the corporation be terminated and that Kittleson execute a new contract of employment with the buyer.

corporate taxes. Smith had preserved the NOL during the merger of his former company that produced Pro Finish, and the latter had been applying this NOL to reduce taxes over several years. Before the asset sale in 1998, the corporation had used all of the NOL except $484,103. The corporation applied the remainder of the NOL to reduce its federal taxable income and thus reduce its tax liability. The corporation argues, however, that its 1998 federal tax liability should have been calculated *without* the benefit of the NOL. Doing so would have raised the total tax liability to $612,013, the amount that the corporation contends should have been used as a deduction from the asset sale proceeds.

¶ 38 We find neither reason nor authority for adopting a hypothetical tax liability rather than actual liability. Although the corporation argues that by using the NOL it "gave up something of value" in lieu of paying cash, we do not find this argument persuasive. Clarke deducted combined 1998 federal and state income tax liability of $447,418 from the asset sale proceeds in calculating fair value per share. If, instead, the NOL was equivalent to a cash payment, it was a payment that had been made before April 30, 1998, and was therefore effectively a prepayment of the corporation's 1998 taxes. The benefit of the NOL therefore should inure to all shareholders just as all shareholders bore the burden of the tax liability. If the court had recalculated the federal tax liability without applying the NOL, the shareholders would have

been treated unequally. The plaintiffs' shares would have been valued at less, they would have been paid less, and the remaining shareholders would have had more cash to pay a non-existent tax liability. We decline to disturb the court's decision on this issue.

■ ¶ 39 The corporation's final allegation regarding fair value is that the court erroneously relied upon Clarke's calculation of per-share value because he had not taken into account 425 shares of authorized but unissued stock. The corporation cited no authority to support its contention that unissued shares, carrying no commitment for issuance, should be considered in determining value per share for the shares which are issued and outstanding. We therefore find no basis upon which we should disturb the court's use of the actual number of issued and outstanding shares in determining per-share value.[13]

■ ¶ 40 The remaining issue on appeal is whether the award of attorneys' fees, expenses, and expert witness fees to the shareholders was proper under .A.R.S. §§ 10–1331(B)(1) or (B)(3) (1996).[14] Subsection (B) of § 10–1331 authorizes an assessment of "fees and expenses of attorneys and experts" in an appraisal proceeding under three circumstances: (1) against the corporation if it did not "substantially comply" with the requirements imposed by the dissenters' rights statute; (2) against the dissenter if fair value does not materially exceed the amount offered; and (3) against *either* the corporation or a dissenter if the court finds that either

---

13. The corporation contends that the existence of the authorized, unissued shares is significant because a buyer who wanted to buy a controlling interest would have to consider them in calculating the number of shares to buy to acquire a majority. The corporation also contends that Clarke "did not dispute" this point during his testimony. The latter contention is not an accurate description of the expert's testimony. When questioned by counsel, Clarke first responded that his answer would "depend" upon who controlled issuance of the additional shares. When asked to assume that Smith was solely empowered to issue the shares, Clarke responded that his answer would "depend." Counsel never asked Clarke to elaborate about what the answer would depend upon. This testimony therefore provides no support for the corporation's argument on this point. We also note that the purchase here was of assets, not of stock.

14. A.R.S. § 10–1331 provides in relevant part:

B. The court may also assess the fees and expenses of attorneys and experts for the respective parties in amounts the court finds equitable either:

1. Against the corporation and in favor of any or all dissenters if the court finds that the corporation did not substantially comply with the requirements of article 2 of this chapter.

. . .

3. Against either the corporation or a dissenter in favor of any other party if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously or not in good faith with respect to the rights provided by this chapter.

party acted "arbitrarily, vexatiously or not in good faith." Although we ordinarily review such awards for abuse of discretion, we review the award in this case de novo because the issue is whether the statute authorizes the award. *Fisher ex rel. Fisher v. Nat'l Gen. Ins. Co.*, 192 Ariz. 366, 369–70, ¶ 13, 965 P.2d 100, 103–04 (App.1998).

¶ 41 We vacate the award of fees and expenses because the statutes do not authorize it. The shareholders fail to address A.R.S. § 10–1331(B)(1) on appeal and the record does not support an A.R.S. § 10–1331(B)(3) award. On appeal, the shareholders argue that "there is sufficient evidence in the record to support a finding of bad faith or arbitrary and vexatious action" by the corporation to support an award. However, the shareholders did not present an argument based on subsection (B)(3) to the superior court. On appeal, we decline to consider arguments that were not presented to the superior court. *Sahf v. Lake Havasu City Ass'n for the Retarded & Handicapped*, 150 Ariz. 50, 53, 721 P.2d 1177, 1180 (App.1986).

¶ 42 Even if the shareholders had preserved this argument for appeal, their argument fails because the court did not predicate its fee award upon a finding under subsection (B)(3) that the corporation acted "arbitrarily, vexatiously or not in good faith." Instead, the award was based upon the court's finding of fact that "[b]ecause the Court's determination of fair value materially exceeded the amount offered by the corporation, [the shareholders] are entitled to an award of attorneys' fees and expert witness fees." However, such an award has no statutory authority. *See* A.R.S. § 10–1331(B) (subsection (B)(2) authorizes only an award *to the corporation* and against the dissenter where fair value does not materially exceed the offer). We therefore vacate the award of fees and expenses to the shareholders.

¶ 43 We affirm the judgment of the superior court in all respects except for the award of attorneys' fees, expenses and expert witness fees, which we vacate. We remand this matter to the superior court for the entry of judgment consistent with this decision.

CONCURRING: SHELDON H. WEISBERG and PATRICK IRVINE, Judges.