2004 UT App 434

BINGHAM CONSOLIDATION COM-
PANY, a Delaware corporation,
Plaintiff and Appellant,

v.

Robert GROESBECK, an individual; Mar-
ilyn Groesbeck Glade, an individual;
and Robert Groesbeck and R. Clay Gro-
esbeck, as Trustees of the Robert R.
Groesbeck Living Trust, a Utah trust,
Defendants and Appellees.

No. 20040141–CA.

Court of Appeals of Utah.

Nov. 26, 2004.

Rehearing Denied Jan. 6, 2005.

John B. Wilson, Parsons Behle & Latimer, Salt Lake City, for Appellant.

Robert S. Clark and Daniel E. Barnett, Parr Waddoups Brown Gee & Loveless, Salt Lake City, for Appellees.

Before Judges DAVIS, JACKSON, and THORNE, Jr.

OPINION

JACKSON, Judge:

¶1 Bingham Consolidation Company (BCC) appeals the judicial appraisal of New Bingham Mary Mining Company (NBMM) in a dissenters' action brought by minority

shareholders of NBMM pursuant to Utah Code sections 16–10a–1325 and 1330. We affirm.

## BACKGROUND

### I. Factual Background

#### A. Introduction

¶ 2 NBMM was incorporated in 1929 with Roy Groesbeck acting as its first president. Since that time, members of the Groesbeck family have been minority shareholders of the company. As of December 31, 1997, these members of the family (here, Defendants) owned approximately 3.8% of the issued and outstanding shares of the company.

¶ 3 From 1929 until January 1, 1998, NBMM's primary assets were comprised of two small mining claims situated in the Oquirrh Mountains. For much of NBMM's history, these two parcels were surrounded on the east by the open pit mining operations of Kennecott Company and, to the west, by the underground mining operations of The Anaconda Company (Anaconda).

#### B. Anaconda Majority and the Mining Lease

¶ 4 By August 18, 1978, Anaconda had become the majority shareholder of NBMM, acquiring 86.63% of the issued and outstanding shares of the company. On August 18, 1978, NBMM informed its shareholders that it was negotiating a lease that would permit Anaconda to "conduct under-ground mining operations on the [NBMM] claims through the facilities of [Anaconda's] Carr Fork Mine." On April 30, 1979, Anaconda, as majority shareholder, caused NBMM to enter into a mining lease (the Mining Lease) that gave Anaconda broad rights

> to develop, extract, take, mine, save and sell minerals from the Property, and to engage in related operations with respect to all veins, loads and mineral deposits contained in or on the Property, to construct and maintain on the Property all works and buildings and other structures, machinery and facilities necessary for such mining and related operations. . . .

In return, Anaconda agreed to pay NBMM a 3% net smelter return production royalty of a minimum of $25,000 per year. The Mining Lease also contained a provision against alienation, granting NBMM the option to void the lease if Anaconda assigned it without NBMM's written consent.

¶ 5 From August 1979 to November 1981, Anaconda mined only the deep "skarn" ore from the NBMM properties using its existing underground shafts. It did not excavate any shallow "porphyry" ore from the surface; nor did it remove any of the "overburden," the surface material sitting atop the claims.

#### C. Kennecott Majority and Assignment of the Mining Lease

¶ 6 In September 1985, Kennecott Utah Copper Corporation (Kennecott) purchased Anaconda's shares in NBMM and Anaconda's other assets located in the Oquirrh Mountains area. Kennecott thereby became NBMM's controlling shareholder and appointed officers, directors, and employees of Kennecott to serve as officers and directors of NBMM.

¶ 7 By November 1987, the Kennecott open pit had expanded to the edge of the NBMM properties. In order for Kennecott's open pit operation to reach the lower deposits on its own claims and its newly acquired Anaconda claims, Kennecott would need to begin stripping the surface of the NBMM claims. As a controlling shareholder of NBMM, Kennecott assigned the Anaconda Mining Lease to itself in November 1987. However, the assignment did not strictly comply with the terms of the non-assignment clause of the Mining Lease because Kennecott-controlled NBMM management did not grant its written consent to the assignment until later in March 1988.

¶ 8 Kennecott began stripping the NBMM claims in 1989 as part of the expansion of its open pit operation but did not begin to extract ore from the claims until 1995. During this period, the Kennecott-controlled management of NBMM failed to formally notify the minority shareholders of the assignment of the Mining Lease to Kennecott. And, at a 1992 meeting of shareholders, a Kennecott director of NBMM falsely informed the mi-

nority shareholders that Kennecott had not stripped the NBMM claims but that the NBMM claims were located "above and around" the pit.

¶ 9 In 1997, the Kennecott-controlled management proposed to merge NBMM into Bingham Consolidation Company (BCC), a wholly owned subsidiary of Kennecott. The merger of the two companies into BCC was executed on January 1, 1998, and Defendants were paid the appraised value of $1.10 per share. Defendants accepted payment but objected to the value of their shares, and, once they had perfected their right to judicial appraisal under Utah Code sections 16–10a–1301 to –1331, an appraisal action was filed on May 14, 1998.

## II. Procedural Background

¶ 10 In August 2003 a bench trial was held to determine the value of the shares. As required by the Utah dissenters' rights statute, BCC was the named plaintiff. The trial court determined that the Kennecott-controlled management of NBMM had breached its fiduciary duty to the minority shareholders by failing to assert NBMM's rights under the lease and misleading the minority shareholders regarding the extent of Kennecott's operations on the NBMM properties. The court also determined that "[t]he value of such claims must be included in the fair value of the Shares ... and is at least equal to the value of the assets given up by the management of [NBMM]." Such "value," the court concluded, "is at least equal to the reasonable compensation [NBMM] would have obtained for the stripping rights to the [NBMM properties] and other assets in a transaction negotiated on an arm's length basis."

¶ 11 By the trial court's assessment, the value of the NBMM shares was based on three assets, namely; (a) the cash held by NBMM, (b) the ore existing on the properties, and (c) the value to Kennecott of the right to expand its open pit mine by stripping the surface of the NBMM properties. The court rejected Kennecott's proposed appraisal as "not reflect[ing] the fair value of [NBMM]'s assets or the Shares" and relied exclusively on the Defendant's computations.

¶ 12 Based on this information, the court entered the following findings:

| Asset | Net Value | |
|---|---|---|
| (a) Cash (as of Dec. 31, 1997) | $ 348,900 | ($ 0.36/share) |
| (b) Extracted Ore (beginning in 1987) | | |
| (i) Deep "skarn" | $ 665,000 | ($ 0.68/share) [1] |
| (ii) Shallow "porphyry" | $ 2,385,745 | ($ 2.46/share) [2] |
| (c) Surface Stripping Rights | $32,640,000 | ($33.61/share) [3] |
| Total | $36,039,645 | ($37.11/share) |

The court ordered Kennecott to pay Defen-

1. Relying on Defendants' expert witness, the court found that

known skarn mineralization lies within the [NBMM claims] and that a prudent person would ascribe a value of $13.3 million to the known skarn mineralization located within the [NBMM claims]. Based on the royalty rate of five percent, $665,000 of that amount ($13.3 million times 0.05 = $665,000) is ascribed to the value of [NBMM] as of December 31, 1997.

2. Relying on Defendants' expert witness, the court found that

[b]ased on a five percent net smelter return royalty rate, the net present value of the shallower, porphyry ore located within the [NBMM claims] is $2,385,745 ($1,368,605 net present value of royalties at 3% royalty rate contained in the report of Defendants' experts times 5/3 = $2,281,008 plus $104,737 net present termi-

nal value of [the Mining Lease] = $2,385,745) as of December 31, 1997.

3. Relying on Defendants' expert witness, the court found that

[A] prudent buyer acting in its own best interests would pay, and a prudent seller acting in its own best interests would accept, fifteen percent of the net present value of $238 million, or $35,700,000. ... [Alternatively,] the net present value of the stripping rights based on royalties is $29,580,043 ([royalty income of] $30,534,341 minus forty percent of $2,385,745 = $29,580,043) as of December 31, 1997. ... [B]oth methods of valuing the stripping rights [are] valid and relevant, and [the Court] adopts the average of the two methods, $32,640.000 or $33.61 per [s]hare. ...

dants $36.01 per share ($37.11 per share less the $1.10 already received) with interest.

## ISSUES

¶ 13 Of primary concern in this case is the question of whether Defendants' allegations of breach of fiduciary duty should be included as part of the court's assessment of "fair value" under Utah Code section 16–10a–1325(1). In answering this question, we must consider the following:

(1) Did Kennecott breach a fiduciary duty?

(2) If so, was the Defendant's knowledge of the breach such that any claim is now barred under the statute of limitations, laches, or equitable estoppel?

(3) If the claim is not barred, was evidence of the breach of fiduciary duty proper in an appraisal proceeding?

(4) If such evidence is proper, did the trial court clearly err in finding the value of NBMM at the time of the merger to be approximately $36 million?

## STANDARDS OF REVIEW

¶ 14 In challenging the trial court's factual findings, BCC "must 'marshal the evidence in support of the [trial court's] findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous.'" *Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 38, 94 P.3d 193 (quoting *Young v. Young,* 1999 UT 38, ¶ 15, 979 P.2d 338).

¶ 15 With respect to the trial court's assessment of "fair value," we recognize that "'[w]hile the ultimate determination of fair value is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value under [state law] is a question of law which we review *de novo.*'" *Hogle v. Zinetics Med., Inc.,* 2002 UT 121, ¶ 10, 63 P.3d 80 (alterations in original) (citation omitted).

## ANALYSIS

### I.   The Utah Dissenters' Rights Statute

¶ 16 Under the Utah dissenters' rights statute, "the corporation shall pay the amount the corporation estimates to be the fair value of the dissenter's shares, plus interest to each dissenter" who meets the applicable requirements. Utah Code Ann. § 16–10a–1325(1). If the shareholder is dissatisfied with the corporation's estimate of fair value, the corporation must petition the court for judicial appraisal on the shareholders' behalf. *See id.* § 16–10a–1330(1)–(4).

¶ 17 In such a proceeding, the dissenting shareholder is "entitled to judgment . . . for the amount, if any, by which the court finds that the fair value of his shares, plus interest, exceeds the amount paid by the corporation" to the shareholder. *Id.* § 16–10a–1330(5)(a). "Fair value" under the statute "means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action." *Id.* § 16–10a–1301(4).

### II.   Methodology for Determining "Fair Value"

¶ 18 The goal of appraisal is to "ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders." *Oakridge Energy, Inc. v. Clifton,* 937 P.2d 130, 132 (Utah 1997) (quotations and citations omitted). There are no fixed methods for valuating shares, and most courts permit "all generally accepted techniques of valuation used in the financial community." *Paskill Corp. v. Alcoma Corp.,* 747 A.2d 549, 556 (Del.2000). According to the Utah Supreme Court, "the three most recognized and relevant elements of fair value for stock valuation purposes are asset value, market value, and investment value." *Hogle,* 2002 UT 121 at ¶ 18, 63 P.3d 80. Although "'all three components of "fair value" may not influence the result in every valuation proceeding, . . . all three should be considered.'" *Id.* (quoting *Oakridge,* 937 P.2d at 135).

### A.   Asset Value

¶ 19 Generally, the value of a corporation's assets "is the least reliable of the three factors in value determination" because it provides "little indication of what people will

pay for the shares." *Oakridge*, 937 P.2d at 133 (quotations and citations omitted). Thus, asset value is usually not reliable unless the corporation is being liquidated. *See Hogle*, 2002 UT 121 at ¶¶ 20–21, 63 P.3d 80.

### B. Market Value

¶ 20 The market price of shares is reliable when "the evidence reveals the existence of a free and open market, characterized by a substantial volume of transactions that makes the market a fair reflection of the judgment of the investing public." *Oakridge*, 937 P.2d at 132 (quotations and citation omitted). When appropriate, market value may be approximated with reference to the trading price of similar companies. *See Hogle*, 2002 UT 121 at ¶¶ 25–31, 63 P.3d 80.

### C. Investment Value

¶ 21 " '[C]ourts have traditionally favored investment value ... as the most important of the three elements.' " *Id.* at ¶ 32 (quoting *Oakridge*, 937 P.2d at 133). This method is expansive, allowing parties to present evidence regarding, among other things, discounted cash flow, discounted earnings, capitalized cash flow, and capitalized earnings. *See id.* at ¶ 33.

### III. The Trial Court Properly Determined Kennecott Had Breached Its Fiduciary Duty

### A. Legal Rules

¶ 22 "Directors and officers have a fiduciary duty of loyalty to their corporation and its stockholders" and are "obliged to ... preserve and enhance the property and earning power of the corporation, even if the interests of the corporation are in conflict with their own personal interests." *Nichol-*

son v. Evans, 642 P.2d 727, 730 (Utah 1982). When an entity controls a majority of shares and the management of the company, it has a fiduciary duty to "deal fairly and openly" with the minority shareholders. *Nash v. Craigco, Inc.*, 585 P.2d 775 (Utah 1978); *see, e.g., McMullin v. Beran*, 765 A.2d 910, 920 (Del.2000) ("When a majority of a corporation's voting shares are owned by a single entity, there is a significant diminution in the voting power of the minority stockholders. Consequently, minority stockholders must rely for protection on the fiduciary duties owed to them by the board of directors.").

¶ 23 This duty to "deal fairly and openly" with the minority shareholders is particularly high when the majority shareholder negotiates with itself to dispose of corporate assets. *See Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 492 (Del.1982) ("[W]here the majority stands on both sides of a transaction, the majority has the burden of establishing the transaction's entire fairness to the minority.").

### B. Kennecott's Breaches of Fiduciary Duty

¶ 24 The trial court in this case concluded that "[NBMM]'s majority shareholder, officers, and directors owed [NBMM] and [NBMM]'s minority shareholders, including Defendants, fiduciary duties to maximize the value of [NBMM] for all shareholders, and the duty to act in a fair and responsible manner with respect to [NBMM] and its minority shareholders." The court also determined that a conflict of interest existed between NBMM's management and NBMM and its minority shareholders in deciding to assign the Mining Lease to Kennecott and that the NBMM management failed to follow fair procedures in assigning the lease.[4] BCC

---

4.   Specifically, the trial court found that Kennecott and the officers and directors of NBMM
   (a) failed to inform the minority shareholders of the value of the NBMM claims, including stripping rights;
   (b) failed to seek or obtain independent counsel to protect the rights of the minority shareholders;
   (c) failed to terminate the Mining Lease after it was assigned to Kennecott without prior written consent;
   (d) failed to inform the minority shareholders that the assignment of the Mining Lease to

Kennecott was defective and therefore voidable;
   (e) failed to object to and concealed from the minority that Kennecott was stripping the surface of the NBMM claims beginning in 1989;
   (f) failed to object to and inform the minority shareholders of Kennecott's removal of ore beginning in 1995;
   (g) failed to provide the minority shareholders with independent counsel with regard to the ongoing stripping and mining of the NBMM claims, the value of the NBMM shares for the

does not appear to dispute these conclusions.[5]

### IV. The Trial Court Properly Found that Defendants' Claim Against Kennecott Would Not Be Time Barred

¶ 25 The trial court determined that Defendants had no actual or implied notice that Kennecott had begun exploiting the NBMM properties[6] or that the Kennecott directors of NBMM had breached their fiduciary duty. BCC challenges the trial court's factual determination, claiming that Defendants had actual or implied notice of Kennecott's intentions as early as 1986, and, as a result, any claim Defendants could assert is barred under the statute of limitations, doctrine of laches, or equitable estoppel.

¶ 26 The issue of notice in this case presents a question of fact and, as we noted earlier, we review the trial court's finding regarding notice for clear error after BCC has marshaled all of the evidence in support of the trial court's finding. *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 38, 94 P.3d 193.

¶ 27 BCC marshals the following evidence to support the trial court's finding:

(a) After Kennecott had begun stripping the NBMM claims, NBMM's management denied the fact at a 1992 shareholder meeting, stating that the NBMM claims were "above and around the open-pit."

(b) Defendants testified that prior to the proposed merger neither Kennecott nor NBMM's management had informed them of the value of the stripping rights, Kennecott's failure to obtain written consent in

assigning the lease, NBMM's right to terminate the lease, or the fact that Kennecott had begun stripping and mining the NBMM claims.

(c) Defendant Clay Groesbeck testified that as of 1992 he was not aware of any information that caused him to believe the minority shareholders needed to bring an action against the management of NBMM.

These facts appear sufficient to support the trial court's finding. Nonetheless, BCC challenges the trial court's finding with the following items of evidence:

(a) After purchasing a majority interest in NBMM, Kennecott announced at a 1986 shareholder meeting that "Kennecott intends to mine across the claims for waste removal and construction of roads."

(b) After the 1986 meeting, Defendants met with Kennecott managers and received a copy of the 1979 mining lease and location map for the NBMM claims.

(c) Defendants were given the name and telephone number of the mine manager to view the claims, but Defendants never contacted him.

(d) In the 1992 shareholders meeting, Kennecott announced the specific tonnages of material it intended to remove from the NBMM claims.

¶ 28 Taken as a whole, BCC's evidence does not indicate that the trial court made a "clear error" in finding that Defendants did not have actual or imputed notice of Kennecott's actions. These facts may tend to indicate that Defendants had an opportunity to inspect the properties and may have been aware that Kennecott intended to

---

purpose of the merger, and the value of the NBMM claims.

5. BCC does not marshal any evidence in support of or against the trial court's factual findings and does not cite any authority to challenge the court's legal conclusions.

6. The trial court found that
[t]he minority shareholders, including Defendants, did not have notice that Kennecott had begun stripping the surface of the Claims and removing ore from the Claims before the Special Meeting of Shareholders at [NBMM] held November 12, 1997, at which shareholders were invited to vote for or against the Merger. BCC also refers to Finding of Fact 38:

Plaintiff has not shown by a preponderance of the evidence that [NBMM]'s minority shareholders, including Defendants, in the exercise of reasonable care, should have discovered, prior to this lawsuit, the breaches of fiduciary duties by Kennecott and [NBMM]'s officers and directors. Plaintiff has not shown by a preponderance of the evidence that [NBMM]'s minority shareholders, including Defendants, lacked diligence or delayed unreasonably in asserting claims for breaches of fiduciary duties, and has not shown by a preponderance of the evidence it was prejudiced by any such delay or lack of diligence. . . .

eventually excavate the properties, but they do not conclusively prove that Defendants knew or should have known Kennecott had already assigned the lease to itself or begun excavations on the properties. Thus, we defer to the trial court's finding and agree that, without notice, Defendants' claim would not be barred by the statute of limitations,[7] laches,[8] or equitable estoppel.[9]

## V. The Trial Court Properly Considered Evidence of Breaches of Fiduciary Duty in the Appraisal Proceedings

### A. Evidence of Breaches of Fiduciary Duty in an Appraisal Proceeding

¶ 29 Having concluded that Defendants' claim is not barred, we now consider whether the trial court properly considered the evidence of Kennecott's breaches of fiduciary duty as part of the appraisal proceeding. The court determined that due to the breaches of fiduciary duty, "Kennecott and [NBMM]'s officers and directors caused [NBMM] and its minority shareholders to receive less than fair value for the assets of [NBMM]." Neither the Utah dissenters' rights statute nor Utah case law addresses the effect breaches of fiduciary duty should have in the valuation of dissenting shareholders' shares. Therefore, the issue is one of first impression in Utah.

¶ 30 In most jurisdictions, an appraisal proceeding is the sole remedy available to a shareholder dissenting to a merger. *See* 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5906.30, at 349, 352 (rev.vol.2000) ("The majority of jurisdictions expressly provides that the appraisal remedy is exclusive, either by statute, or by judicial construction."). However, courts generally agree that "[t]he appraisal remedy . . . may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del.1983) (permitting "equitable and monetary relief as may be appropriate").[10] Thus, a claim of breach of fiduciary duty should be considered outside of the appraisal proceeding. *See Sieg Co. v. Kelly*, 568 N.W.2d 794, 802 (Iowa 1997) ("[C]laims of fraud, self-dealing or breach of fiduciary duty . . . are separate and distinct and can be redressed *outside* the appraisal remedy."); *Alabama By–Products Corp. v. Neal*, 588 A.2d 255, 257 (Del.1991) ("[T]o authorize the joinder of appraisal and unfair dealing actions as proposed here would result in a hybrid appraisal action, effectively broadening the legislative remedy . . . ." (quotations and citations omitted)).[11]

7. "[A] statute of limitations is tolled 'until the discovery of facts forming the basis for the cause of action,' " particularly "in situations where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 75, 82 P.3d 1076 (quoting *Warren v. Provo City Corp.*, 838 P.2d 1125, 1128–29 (Utah 1992)).

8. "Laches bars a recovery when there has been a delay by one party causing disadvantage to the other party." *Plateau Mining v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 731 (Utah 1990).

9. Equitable estoppel requires the complaining party to make "a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted." *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 34, 989 P.2d 1077.

10. *See also Twenty Seven Trust v. Realty Growth Investors*, 533 F.Supp. 1028, 1036 (D.Md.1982) (citations omitted) ("The prevailing view among state courts . . . is that the statutory appraisal proceeding is not the dissenters' exclusive reme-

dy in cases of fraud, illegal purposes or other wrongful conduct by the majority or controlling shareholder."); *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (Del.2001) ("[A]bsent fraud or illegality, appraisal is the exclusive remedy available to a minority shareholder who objects to a short-form merger."); *Fleming v. International Pizza Supply Corp.*, 676 N.E.2d 1051, 1055 (Ind.1997) ("The [appraisal] remedy is the exclusive remedy unless the transaction is 'unlawful' or 'fraudulent.' " (citation omitted)); *Sieg Co. v. Kelly*, 568 N.W.2d 794, 802 (Iowa 1997) ("[T]he narrow remedy provided by an appraisal action does not encompass claims of fraud, self-dealing or breach of fiduciary duty. . . .").

11. However, courts do not agree as to the type of relief permitted in such situations. Some jurisdictions recognize that claims of fraud, breach of fiduciary duty, and illegality are not appropriate for an appraisal hearing, but allow dissenters outside the proceeding to seek equitable relief while limiting claims for monetary relief to an appraisal proceeding. *See Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 840–42 (Colo.2004); *Breed v. Barton*, 54 N.Y.2d 82, 444 N.Y.S.2d 609, 429 N.E.2d 128, 129–31 (1981).

¶ 31 Nonetheless, courts recognize at least two circumstances in which evidence of breach of a fiduciary duty is appropriately considered within the appraisal proceeding. First, a dissenting shareholder should be limited to the appraisal remedy when he claims, in essence, that the primary effect of the majority shareholder's .breach of fiduciary duty was to diminish share value. *See Szaloczi v. John R. Behrmann Revocable Trust,* 90 P.3d 835, 840–42 (Colo.2004) ("A dissenting shareholder may not seek compensatory damages in addition to the appraisal remedy when the complaint 'boils down to nothing more than a complaint about stock price.' " (quoting *Grace Bros., Ltd. v. Farley Ind., Inc.,* 264 Ga. 817, 450 S.E.2d 814, 817 (1994))).[12] Appraisal is appropriate under such circumstances because it awards essentially the same relief (lost value to shares) and avoids the danger of awarding duplicate damages that would otherwise result from a separate tort action for compensatory damages. *See Szaloczi,* 90 P.3d at 840–41 (citing *Breed v. Barton,* 54 N.Y.2d 82, 444 N.Y.S.2d 609, 429 N.E.2d 128, 130 (1981)).

¶ 32 Similarly, the court may consider evidence of breach of fiduciary duty in an appraisal to assess the credibility of the majority shareholder's proposed valuation. *See Alabama–By–Products,* 588 A.2d at 257 (affirming the Court of Chancery's determination that "if corporate fiduciaries engage in self-dealing and fix the merger price by procedures not calculated to yield a fair price, these facts should, and will, be considered in assessing the credibility of the respondent corporations' valuation contentions" (quotations and citation omitted)). We too have recently acknowledged that when assessing a party's proposed valuation of shares, a trial court may rely on that party's trustworthiness in adopting or rejected its valuation. *See Kraatz v. Heritage Imps.,* 2003 UT App 201, ¶¶ 10–11, 71 P.3d 188 (affirming that trial court properly relied on owner's valuation of auto dealership over competing expert valuation because owner is "one of the largest and most reputable automobile dealers in Utah").

¶ 33 In the present case, Defendants originally brought both an appraisal action and an action seeking compensatory and punitive damages. Although Defendants' breach of fiduciary duty claim is a type of claim for which the "[t]he appraisal remedy ... may not be adequate," *Weinberger,* 457 A.2d at 714, the trial court may include it in an appraisal proceeding when the claim, in essence, " 'boils down to nothing more than a complaint about stock price,' " *Szaloczi,* 90 P.3d at 842 (quoting *Grace Bros., Ltd.,* 450 S.E.2d at 817). Thus, the court properly consolidated the cases into a single appraisal proceeding because the core of Defendants' action is to recover only that increment of value lost due to Kenencott's self-dealing. Moreover, were Defendants allowed to maintain both an appraisal proceeding and an independent suit for compensatory damages, the two cases would likely result in duplicate damages.

¶ 34 We also note that it was proper for the trial court, after determining that Kennecott had engaged in self-dealing, to discount BCC's expert testimony as "unfairly favorable to Kennecott," "unfavorable to the minority shareholders," and "does not reflect the fair value of [NBMM]'s assets or the Shares."

---

12. *See also Steinberg v. Amplica, Inc.,* 42 Cal.3d 1198, 233 Cal.Rptr. 249, 729 P.2d 683, 691–92 (1986) (noting that courts have included claims in appraisal proceedings when dissenting shareholders "prayed ... for the value their shares would have realized absent the breach of fiduciary duty—a remedy which would be available ... by way of appraisal"); *Fleming v. Int'l Pizza Supply Corp.,* 676 N.E.2d 1051, 1057 (Ind.1997) ("[I]t is perfectly consistent with the shareholder's claim for payment of the appraisal process for the shareholder to allege that the value assigned to the shares in the merger or asset sale was too low because of the breach of fiduciary duty or fraud on the part of majority shareholders."); *Werner v. Alexander,* 130 N.C.App. 435, 502 S.E.2d 897, 901 (1998) (noting that even with claims of fraud "a remedy beyond [appraisal] is not available where the shareholder's objection is essentially a complaint regarding the price which he received for his shares." (quotations and citation omitted)); *Walter J. Schloss Assocs. v. Arkwin Ind., Inc.,* 90 A.D.2d 149, 455 N.Y.S.2d 844, 851–52 (N.Y.App.Div.1982) (Mangano, J., dissenting), *rev'd, adopting dissenting opinion,* 61 N.Y.2d 700, 472 N.Y.S.2d 605, 460 N.E.2d 1090 (1984) (limiting dissenting shareholder's right to seek relief outside of appraisal when there is an "identical relief available to him in appraisal proceedings").

### B. BCC's Arguments Against Inclusion

¶ 35 BCC makes four arguments for excluding Defendants' breach of fiduciary duty allegations from the appraisal proceeding. These, however, do not persuade us to alter our conclusion.

¶ 36 First, BCC argues that the court's appraisal does not consider the particular value of the NBMM properties to the acquiring corporation. For this argument, BCC relies on language from *Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 17, 63 P.3d 80. However, this reliance appears to be misplaced.

¶ 37 In that case an 81% shareholder offered to buy out a minority shareholder. The minority shareholder argued that, in valuing its shares, the court should have included the "unique value" of the shares to the majority shareholder who would, after the merger, have complete control of the company. *Id.* The court declined to include the post-merger value of their shares to the majority emphasizing that

> "fair value" is not measured by any unique benefits that will accrue to the acquiring corporation.... [T]he appraisal proceeding is not at all concerned with the losses to the particular dissenting shareholders or with the benefits derived by the particular acquiring corporation *in the merger* ...."

*Id.* (quotations and citations omitted) (emphasis added). The court goes on to explain that a valuating court considers "losses and benefits [as] would be reflected in the price that would be bargained out in a completely free market between any willing buyer and any willing seller *in the absence of the merger*." *Id.* (emphasis added).

¶ 38 As applied to the present case, *Hogle* forbids the court only from considering the value of the NBMM shares to Kennecott in anticipation of the merger. Nonetheless, it permits the court to include any value the NBMM properties had to Kennecott absent the merger. Here, although NBMM properties were of particular value to Kennecott, this value was not created as a result of the merger; it existed well before the merger and was a subject of negotiation between the two companies for many years. Thus, a willing buyer of the shares, even without the prospect of a merger, would have likely assessed the value of the shares in light of the strategic location of NBMM's properties and their value to Kennecott.

¶ 39 Second, BCC argues that "the trial court's valuation amounts to an award of damages for breach of fiduciary duty arising from events which occurred many years prior to the merger."[13] In essence, BCC asserts that a breach of fiduciary duty claim cannot be included under an investment value methodology or an asset value methodology. However, this strict understanding of appraisal methods is contrary to *Hogle*, which emphasized that appraisal is a flexible process in which the court references all three methods, even if certain of them do not directly apply. *See* 2002 UT 121 at ¶ 18, 63 P.3d 80. Similarly, *Hogle* should not be read to define precisely what elements should be considered when applying a particular methodology; rather, we agree with other jurisdictions that a court should make use of "all generally accepted techniques of valuation used in the financial community." *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 556 (Del.2000). As we have said, an award of damages for breach of fiduciary duty would be inappropriate, but the court may consider the effect of the breach on stock value.

¶ 40 Third, BCC warns that allowing a minority shareholder to assert claims of breaches of fiduciary duty in an appraisal permits such shareholders to "avoid[ ] all of the requirements for shareholder derivative suits" and to wield disproportionate and retroactive influence over corporate decisions.

---

13. BCC also makes a similar argument that the court erred in including "value which [NBMM] and the minority shareholders ... should have received from Kennecott years earlier." BCC claims this violates the statutory definition of "fair value" based on "the value of the shares immediately before the effectuation of the corporate action." Utah Code Ann. § 16–10a–1301(4) (2001). However, we conclude that any amount owed to the corporation, even if incurred years before the merger, can still be included as an asset with value "immediately before" the merger.

The first of these concerns has little impact in light of the fact that Utah courts have recognized that in closely held corporations, such as NBMM, shareholders may circumvent the derivative suit process and sue directly. *See Aurora Credit Servs., Inc. v. Liberty West Dev., Inc.*, 970 P.2d 1273, 1281 (Utah 1998) ("We ... hold that a court may allow a minority shareholder in a closely held corporation to proceed directly against corporate officers."); *Arndt v. First Interstate Bank*, 1999 UT 91,¶ 20, 991 P.2d 584. The second concern is also easily addressed: permitting dissenters to raise questions of fiduciary duty in the appraisal proceeding allows them to undo corporate decisions only to the extent that such decisions are fraudulent, illegal, or contrary to fiduciary duty.

¶ 41 Finally, BCC contends that the breaches of fiduciary duty claims are too speculative to affect share value. We agree that purely speculative claims have no place in an appraisal. *See Lebman v. Nat'l Union Elec. Corp.*, 414 A.2d 824, 825–26 (Del.Ch. 1980) (determining that the possible award in a pending antitrust claim against a competitor was too speculative to be included in an appraisal). However, other courts have held that when the outcome of an action is reasonably certain and would affect an investor's appraisal of the shares, then it should be included in the valuation. *See MT Props., Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383, 389–90 (Minn.Ct.App.1992) ("Elements affecting value which 'are not fairly shown to be reasonably probable' should not be considered in valuations.... However, an event is reasonably probable if factors indicate the event 'fairly might be brought forward and reasonably be given substantial weight' in 'fair negotiation between an owner willing to sell and a purchaser desiring to buy.'" (citation omitted)) (determining that a reduction in company value was appropriate due to likely environmental and labor liabilities). Here, the court made particularized findings that Kennecott had breached its fiduciary duty and determined that the resultant loss in share value can be calculated with reasonable certainty.

## VI. The Court Did Not Clearly Err In Determining the Value of NBMM

¶ 42 In appraising the value of NBMM, the trial court found that if Kennecott had entered into an "arm's length negotiation" for the NBMM property, it "would have resulted in fair and reasonable compensation" to NBMM of approximately $36 million. BCC claims that this result is not supported by the evidence, which, according to BCC, indicates NBMM was worth $1 million to $3.4 million. Again, we review the trial court's findings of fact for clear error after BCC has marshaled the evidence in support of the trial court's conclusion. *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28,¶ 38, 94 P.3d 193 (citing *Young v. Young*, 1999 UT 38,¶ 15, 979 P.2d 338).

¶ 43 In its briefs, BCC has properly marshaled the evidence supporting the trial court's finding. The trial court seems to have relied primarily on three items of evidence to determine that NBMM was worth $36 million: (a) Defendants' expert testified that, in his estimation, a prudent buyer in hypothetical circumstances would agree that $36 million would be fair compensation had NBMM granted Kennecott rights to strip and mine the NBMM properties; (b) evidence showed that Kennecott had determined in a 1981 internal report that the stripping rights to the NBMM properties would be worth millions or even billions of dollars to the company; and (c) although Kennecott purchased similarly situated mining claims in the area from Anaconda for $5 million, Kennecott testified that Anaconda was getting out of the mining business and sold its claims at a bargain, or "nuisance value." We hold that this provides sufficient evidence to support the trial court's finding.

¶ 44 The evidence presented by BCC does not alter our conclusion. BCC does not attack the expert's valuation which the court used to reach the $36 million figure—rather, BCC provides only general assertions that the $5 million Kennecott paid for the Anaconda claims is a reasonable indicator of value and that Kennecott would never have agreed to pay NBMM $36 million for the use of its

properties.[14] Although these assertions may offer a reasonable alternative to the trial court's finding, they do not establish that "the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous." *Eggett*, 2004 UT 28 at ¶ 38, 94 P.3d 193 (quotations and citation omitted).

¶ 45 BCC also contends that the Mining Lease unambiguously granted Kennecott the right to strip the NBMM properties in exchange for the royalty payments described in the lease. According to BCC, these royalty payments indicate fair value for the properties. The trial court disagreed and found that the terms of the lease were ambiguous and, in light of extrinsic evidence, did not grant rights to strip the NBMM properties. The court also found that the royalties were only reasonable for underground mining and not surface stripping. For our purposes, it suffices to conclude that the Mining Lease does not provide clear evidence of value. For, even if we were to unravel the knot of questions regarding the legitimacy of Kenne-

cott's assignment to itself and its consequent voidability, we would still be confronted with questions of the ambiguity of the lease's terms. Considering these difficulties, the trial court properly discounted the relevance of the Mining Lease as a gauge of value.

## CONCLUSION

¶ 46 Having determined that the trial court properly assessed the effect of Kennecott's breaches of fiduciary duty upon NBMM's appraisal value and awarded the lost value to Defendants, we affirm.

¶ 47 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.

---

**14.** On this second point, BCC claims that any negotiation between Kennecott and NBMM would not have resulted in a purchase price of $36 million because Kennecott would have exercised negotiation leverage by asserting its rights to the property under the Mining Lease and using its ability to "reconfigure[ ] its mine and wait[ ] out [NBMM]."